# ASSOCIATION OF WESTINGHOUSE SALARIED EMPLOYEES *v.* WESTINGHOUSE ELECTRIC CORP.

No. 51.   Argued November 17–18, 1954.—Decided March 28, 1955.

438

*David E. Feller* argued the cause for petitioner. With him on the brief were *Arthur J. Goldberg* and *Thomas E. Harris*.

*Mahlon E. Lewis* argued the cause for respondent. With him on the brief was *Loyal H. Gregg*.

MR. JUSTICE FRANKFURTER announced the judgment of the Court and an opinion in which MR. JUSTICE BURTON and MR. JUSTICE MINTON join.

Respondent is a Pennsylvania corporation engaged in the manufacture and sale of electrical equipment in interstate commerce. Petitioner, an unincorporated labor organization and the collective bargaining representative of some 5,000 salaried employees at two of respondent's plants, filed this suit against respondent in the United States District Court for the Western District of Pennsylvania to enforce collective bargaining agreements then in effect between it and respondent. The suit was brought under § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U. S. C. § 185, and the Federal Declaratory Judgment Act, 62 Stat. 964, as amended, 28 U. S. C. §§ 2201, 2202.

More specifically, petitioner alleged that under the contracts respondent was obligated to pay the employees represented by petitioner their full salary during April 1951, regardless of whether they missed a day's work, unless the absence was due to "furlough" or "leave of absence," and that respondent had violated the contracts by deducting from the pay of some 4,000 of those employees their wages for April 3, when they were absent. No reason was given for their absence, but it was alleged that the reason was not furlough or leave of absence. The employees were not named and were not made parties to the suit. Petitioner requested the court to interpret the contracts, declare the rights of the parties, compel respondent to make an accounting (and name the employees involved and the amounts of unpaid salaries), and enter a judgment against respondent and in favor of the individual employees for the unpaid wages.

Respondent moved to dismiss the complaint on three grounds: the court lacked jurisdiction over the subject matter, petitioner was the wrong party plaintiff under

Fed. Rules Civ. Proc., 17 (a), and the complaint failed to state a claim upon which relief could be granted. The district court held that it had jurisdiction over the subject matter and that petitioner was a proper plaintiff but dismissed the complaint for failure to state a claim for relief, without prejudice to petitioner's right to amend. It held that, without affirmative averments as to the cause of the absences from work, it must be assumed the absences were voluntary, and that the bargaining contracts did not obligate respondent to pay wages during voluntary absences. 107 F. Supp. 692.

The Court of Appeals for the Third Circuit, sitting *en banc*, three judges dissenting, vacated the district court's order dismissing the complaint on the merits, and directed a dismissal for lack of jurisdiction. After stating that § 301 "is a grant of federal-question jurisdiction and thus creates a federal, substantive right" and reviewing various theories explaining the relationship between union, employer and employees under a collective bargaining agreement, the court adopted an "eclectic theory," based primarily upon language in *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332. The bargaining contract, said the Court, obligates the employer to include in the contracts of hire with each employee the terms and conditions which had been settled between the union and the employer, but the collective contract itself is not a contract of hire. Not until an employee enters into an individual contract of hire and performs services does the employer become bound to pay the particular employee the specified wages. It follows, said the Court, that if there was a breach in this case, it was a breach of the employment contracts with the individual employees who were not paid. Section 301, on the other hand, grants jurisdiction to federal courts only over cases involving breaches of the collective bargaining contract between the union and the employer. There-

fore, it was concluded, the district court was without jurisdiction of the suit. 210 F. 2d 623.

The dissenting judges agreed that a failure to pay wages might well constitute a breach of the individual hiring contracts as a basis of common-law suits by the employees. But they deemed the breach, if any, also a breach of the collective bargaining contracts and as such cognizable in the federal court under § 301. They concluded that Rule 17 (a) permitted the union to sue alone, without joinder of the employees, to vindicate the rights of these employees as a class, such employees being beneficiaries of the collective contracts. They agreed with the district court, however, that, on this complaint, the bargaining contracts did not make respondent liable, since the cause of the absences from work was not alleged. 210 F. 2d, at 630.

The case was brought here for construction of a section of the Taft-Hartley Act which has proved a fertile source of difficulty for the lower courts. 347 U. S. 1010.

1. In dealing with an enactment such as § 301 of the Labor Management Relations Act,[1] it is necessary first

---

[1] Section 301 provides:

"SEC. 301. (a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

"(b) Any labor organization which represents employees in an industry affecting commerce as defined in this Act and any employer whose activities affect commerce as defined in this Act shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its

to ascertain its jurisdictional scope, more particularly, whether it extends to the suit at hand.  Here, as may not infrequently be the case, this question turns in large measure on what sources a federal court would be required to draw upon in determining the underlying substantive rights of the parties—in this case, in deciding whether the union has the contract right which it asserts.  If Congress has itself defined the law or authorized the federal courts to fashion the judicial rules governing this question, it would be self-defeating to limit the scope of the power of the federal courts to less than is necessary to accomplish this congressional aim.  If, on the other hand, Congress merely furnished a federal forum for enforcing the body of contract law which the States provide, a serious constitutional problem would lie at the threshold of jurisdiction.  Moreover, if the function of § 301 is merely that of providing a federal forum for state law, there are good reasons for finding that, despite the broad wording of § 301, Congress did not intend to confer jurisdiction over this type of suit.

---

assets, and shall not be enforceable against any individual member or his assets.

"(c) For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its· duly authorized officers or agents are engaged in representing or acting for employee members.

"(d) The service of summons, subpena, or other legal process of any court of the United States upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization.

"(e) For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

If the section is given the meaning its language spontaneously yields, it would seem clear that all it does is to give procedural directions to the federal courts. "When an unincorporated association that happens to be a labor union appears before you as a litigant in a case involving breach of a collective agreement," Congress in effect told the district judges, "treat it as though it were a natural or corporate legal person and do so regardless of the amount in controversy and do not require diversity of citizenship."

Since a statute like the Taft-Hartley Act is an organism, § 301 must be placed in the context of the legislation as a whole. So viewed, however, the meaning which the section by itself affords is not affected. While some sections of the Act in certain instances may be relevant in actions for breach of contract and as such binding also on the States,[2] no provision suggests general application of

---

[2] Section 1 of the Act states the congressional aim to be the enumeration of "legitimate rights" of employers and employees and the definition of practices to be outlawed in the interest of furthering industrial peace. No inference pertinent to the jurisdictional content of § 301 can be drawn from this introductory generalization. No other provision of the Act indicates that substantive federal law was to guide the determination of the contractual rights and liabilities that are to flow from a collective bargaining contract. Section 302 contains a highly specialized restriction on the legality of employers' agreements to make payments to employee representatives. Section 303 provides a federal right to recover damages suffered as a result of improper boycotts. Section 8 enumerates unfair labor practices; these may in some instances become relevant to the validity or interpretation of a collective agreement. Certain procedural safeguards are placed about the collective bargaining agreement: an obligation to confer in good faith on questions arising under it; a duty to follow certain steps prior to terminating or modifying the agreement unilaterally. (§§ 8 (d), 204 (a) (2).) And a limited number of substantive rights conferred under the Act may incidentally involve the interpretation of the collective agreement. (*E. g.*, § 9 (a).) It is significant, however, that breach of contract is not an "unfair labor

defined or theretofore available federal substantive law in actions arising under § 301.

This examination would conclude the construction of the section by English courts, that is, by any court reading legislation as it is written without drawing on parliamentary debates. And considering that the construction we have found seems plain, the so-called "plain meaning rule," on which construction is from time to time rested also in this Court, likewise makes further inquiry needless and indeed improper. But that rule has not dominated our decisions. The contrary doctrine has prevailed. See *Boston Sand & Gravel Co.* v. *United States,* 278 U. S. 41, 48; *United States* v. *Dickerson,* 310 U. S. 554, 561. And so we proceed to an examination of the legislative history to see whether that raises such doubts that the search for meaning should not be limited to the statute itself.

Congressional concern with obstacles surrounding union litigation began to manifest itself as early as 1943. In the first session of the 78th Congress and thereafter numerous bills were introduced proposing various solutions, including federal incorporation,[3] denial of rights under the Wagner Act to contract violators,[4] creation of a cause of action for strikes and other acts in violation of the collective bargaining contract,[5] and grants of federal juris-

---

practice." A proposal to that end was contained in the Senate bill, but was deleted in conference with the observation: "Once parties have made a collective bargaining contract the enforcement of that contract should be left to the usual processes of the law and not to the National Labor Relations Board." (H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 42.) The Act expressly defers to state law on the question of legality of the union shop provision. (§§ 8 (a)(3), 14 (b).)

[3] H. R. 1781, 78th Cong., 1st Sess.; H. R. 4960, 79th Cong., 1st Sess.; S. 2488, S. J. Res. 133; H. J. Res. 318, 79th Cong., 2d Sess.; S. J. Res. 8; H. J. Res. 43, 80th Cong., 1st Sess.

[4] S. 1641, 79th Cong., 1st Sess.

[5] S. 1656, 79th Cong., 1st Sess.; S. 123; H. R. 267, 1430, 80th Cong., 1st Sess.

diction similar to the present § 301.[6]   Only one of these, the so-called "Case bill," was acted upon.   This bill, which passed both Houses in 1946, only to fail through President Truman's veto, included as § 10 a provision somewhat similar to the present section.   That section passed the House in the following form:

> "SEC. 10. BINDING EFFECT OF COLLECTIVE-BARGAIN-ING CONTRACTS.—All collective-bargaining contracts shall be mutually and equally binding and enforceable against each of the parties thereto, any other law to the contrary notwithstanding.   In the event of a breach of any such contract or of any agreement contained in such contract by either party thereto, then, in addition to any other remedy or remedies existing, a suit for damages for such breach may be maintained by the other party or parties in any State or United States district court having jurisdiction of the parties."   H. R. 4908, 79th Cong., 2d Sess.

Discussion in that chamber was not enlightening, due perhaps to the fact that the Case bill had been substituted on the House floor for the text of a very different bill and thus had never been considered in committee. Section 10 was presented as necessary to achievement of "mutuality" of obligation between employer and union, but there was no guiding explanation of the nature of the obstacle to mutuality.   The language of the section, however, gave support to the view that a federal cause of action was to be created.

After the bill passed the House, hearings were held on it by the Senate Committee on Education and Labor, during which Senator Taft pointed out to Representative Case that, in his view, the section as written failed to deal

---

[6] S. 55, 404; H. R. 725, 80th Cong., 1st Sess.   Under S. 937, 80th Cong., 1st Sess., a system of federal labor courts to hear all cases arising out of collective bargaining contracts would have been established.

with the real problem, which was not substantive enforceability but procedural difficulty in obtaining jurisdiction over unincorporated labor organizations. Mr. Case agreed that the section should be redrafted to reach that problem.[7] The Committee reported the bill without § 10, asserting that as it passed the House the section was "based upon a misapprehension as to the legal responsibility of the parties under such contracts," that such contracts "are at present legally enforceable in the courts," and that to promote litigation concerning them would be undesirable.[8] Senators Ball, Taft and H. Alexander Smith filed a minority report conceding that collective agreements "theoretically are legally enforceable contracts" but contending that action was necessary to overcome practical obstacles to enforcement arising from the status of unions as unincorporated associations. They proposed a differently worded section later adopted in substance by both Houses, which closely approximated the wording of the present § 301.[9]

---

[7] Hearings before a Subcommittee of the Senate Committee on Education and Labor on H. R. 4908, 79th Cong., 2d Sess. 11.

[8] S. Rep. No. 1177, 79th Cong., 2d Sess. 8.

[9] *Id.*, Part 2, at 3–4, 10–14. The section which they proposed was as follows:

"SEC. —. (a) Suits for violation of a contract concluded as the result of collective bargaining between an employer and a labor organization if such contract affects commerce as defined in this Act may be brought in any district court of the United States having jurisdiction of the parties.

"(b) Any labor organization whose activities affect commerce as defined in this Act shall be bound by the acts of its duly authorized agents acting within the scope of their authority from the said labor organization and may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States: *Provided,* That any money judgment against such labor organization shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets."

In introducing this proposed amendment, Senator Taft stated:

". . . All we provide in the amendment is that voluntary associations shall in effect be suable as if they were corporations, and suable in the Federal courts if the contract involves interstate commerce and therefore involves a Federal question. . . ." 92 Cong. Rec. 5705.

This rather casual *non sequitur* seems to suggest reliance not on the existence or establishment of any substantive federal law governing collective bargaining contracts to create a "federal question" in the technical sense relevant to jurisdiction of district courts, but on the mere power of Congress to enact such law.[10] While some statements on the Senate floor by opponents of the amendment are ambiguous,[11] all authoritative materials indicate the strictly procedural aim of the section. The aim was to open the federal courts to suits on agreements solely because they were between labor organizations and employers without providing federal law for such suits.

In the first session of the 80th Congress, bills introduced independently in both Houses contained sections strikingly similar to the final version of § 10 of the Case

---

[10] During the hearings on the Taft-Hartley bill, Senator Taft suggested that the fact that the collective bargaining agreement was the product of the exercise of federally created rights and duties was an adequate justification for federal jurisdiction. Hearings before Senate Committee on Labor and Public Welfare, on S. 55 and S. J. Res. 22, 80th Cong., 1st Sess. 57.

[11] See the statements of Senators Murray and Magnuson which seemed to suggest that § 10 would create "Federal rights." 92 Cong. Rec. 5708, 5720, 5411–5415. Senator Murray, however, appears to have been thinking only of the procedural and jurisdictional rights admittedly conferred by § 10. Senator Magnuson spoke before Senator Taft introduced the amendment containing § 10, and may not have understood that it differed considerably from the House version.

bill.[12]  Discussion was more analytical.  While generalities in praise of mutuality and enforceability reappear, it was evident that the specific desire was to remove procedural obstacles to suit by and against the union.  Senator Pepper and Secretary of Labor Schwellenbach deemed the measure one "to provide a Federal forum" for suits on contracts based on local law.[13]  It was assumed that this would result in mutual enforceability, which in turn would further labor harmony.  The testimony of Secretary Schwellenbach (who together with the labor unions opposed § 301), minority reports in both Houses,[14] and opposition statements on the floor of the Senate [15] directed

---

[12] H. R. 3020, 80th Cong., 1st Sess. § 302; S. 1126, 80th Cong., 1st Sess. § 301.

[13] Hearings before Senate Committee on Labor and Public Welfare on S. 55 and S. J. Res. 22, 80th Cong., 1st Sess. 58.  During these hearings Secretary Schwellenbach stated: "Since the field of necessary legislative action is so narrow, I see no reason why the gates of the Federal courts should be opened so wide as to invite litigation, as is done by this proposed section.  Speaking as a lawyer and former member of the Federal judiciary, I have an objection to the abandonment in this field of the requirement of the $3,000 amount in controversy as a prerequisite to Federal jurisdiction.  This is a right which has been jealously guarded by the Congress and by the Federal courts.  To have them cluttered up with a great mass of petty litigation involving amounts less than $3,000 would bring them back to the position which they occupied during prohibition days when they became just a little bit above the level of the average police court insofar as criminal work was concerned.

"I do not see why it is necessary in this field to abandon the diversity of citizenship requirement.  In fact I doubt that it can be abandoned constitutionally.  The Constitution, as you know, limits suits in the Federal courts to cases arising under the Constitution and the laws of the United States or involving diversity of citizenship." *Id.*, at 56.

[14] H. Rep. No. 245, 80th Cong., 1st Sess. 108–110; S. Rep. No. 105, 80th Cong., 1st Sess., Part 2, 13–15.

[15] 93 Cong. Rec. 4033, 4906 (Senator Murray); *id.*, at 4768 (Senator Thomas).

attention to the fact that state law would govern actions under § 301 and that this, diversity jurisdiction apart, would raise a substantial constitutional question. No denial of the first of these assertions appears. Senator Taft did not justify § 301 as dependent on federal substantive law governing interpretation of collective bargaining contracts:

> "Mr. President, title III of the bill . . . makes unions suable in the Federal courts for violation of contract. As a matter of law unions, of course, are liable in theory on their contracts today, but as a practical matter it is difficult to sue them. They are not incorporated; they have many members; in some States all the members must be served; it is difficult to know who is to be served. But the pending bill provides they can be sued as if they were corporations and if a judgment is found against the labor organization, even though it is an unincorporated association, the liability is on the labor union and the labor-union funds, and it is not on the individual members of the union, where it has fallen in some famous cases to the great financial distress of the individual members of labor unions." 93 Cong. Rec. 3839.

Legislative history, in its relevant aspects, thus reinforces the meaning conveyed by the statute itself as a mere procedural provision.

2. From this conclusion inevitably emerge questions regarding the constitutionality of a grant of jurisdiction to federal courts over a contract governed entirely by state substantive law, a jurisdiction not based on diversity of citizenship yet one in which a federal court would, as in diversity cases, administer the law of the State in which it sits. The scope of allowable federal judicial power that this grant must satisfy is constitutionally defined as

450

"Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." Art. III, § 2.

Almost without exception, decisions under the general statutory grants of jurisdiction strikingly similar to the constitutional wording, have tested jurisdiction in terms of the presence, as an integral part of plaintiff's cause of action, of an issue calling for interpretation or application of federal law.[16] Although it has sometimes been suggested that the "cause of action" must derive from federal law,[17] it has been found sufficient that some aspect of federal law is essential to plaintiff's success.[18] The litigation-provoking problem has been the degree to which federal law must be in the forefront of the case and not be remote, collateral or peripheral.

It has generally been assumed that the full constitutional power has not been exhausted by these general jurisdictional statutes.[19] And in two lines of decision, under special jurisdictional grants for actions by or against federally incorporated organizations [20] and trustees in bankruptcy,[21] federal jurisdiction has been sustained despite the fact that the traditional "federal question" theory of jurisdiction has considerable latitude if satisfied by the

---

[16] *E. g., Gully* v. *First Nat. Bank,* 299 U. S. 109.

[17] See *American Well Works Co.* v. *Layne & Bowler Co.,* 241 U. S. 257, 260.

[18] *Smith* v. *Kansas City Title & Trust Co.,* 255 U. S. 180.

[19] See, *e. g.,* Mishkin, The Federal "Question" in the District Courts, 53 Col. L. Rev. 157, 160; Shulman and Jaegerman, Some Jurisdictional Limitations on Federal Procedure, 45 Yale L. J. 393, 405, n. 47; Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 225.

[20] *Osborn* v. *Bank of the United States,* 9 Wheat. 738; *Pacific Railroad Removal Cases,* 115 U. S. 1.

[21] *Schumacher* v. *Beeler,* 293 U. S. 367; *Williams* v. *Austrian,* 331 U. S. 642.

contingent likelihood of presentation of a federal question. Analysis of these cases in terms of that theory reveals analogies to § 301. For federal law is, in certain respects, in the background of any action on a collective bargaining agreement affecting commerce: § 301 vests rights and liabilities, which under state law are distributed among the union members, in a legal "entity" recognized by federal law for purposes of actions on collective bargaining agreements in the federal courts; in such actions, the validity of the agreement may be challenged on federal grounds— that the labor organization negotiating it was not the representative of the employees involved, or that subsequent changes in the representative status of the union have affected the continued validity of the agreement.[22]

Federal jurisdiction based solely on the fact of federal incorporation has, however, been severely restricted by Congress,[23] and this Court has cast doubt on its continued vitality.[24] Whether the precedent might be extended to meet the substantial difficulties encountered under § 301 would pose a serious constitutional problem.

Recognition of jurisdiction in the bankruptcy cases, despite the fact that the actions might be governed solely by state law, draws on the reach of the bankruptcy power, which may reasonably be deemed to sweep within its scope interests sufficiently related to the main purpose of bankruptcy to call for organic treatment. To attempt to reason from these cases to § 301 raises the equally if not more serious question of what, if anything, is encompassed

---

[22] Cf. *La Crosse Telephone Corp.* v. *Wisconsin Employment Relations Board,* 336 U. S. 18.

[23] 62 Stat. 934, 28 U. S. C. § 1349: "The district courts shall not have jurisdiction of any civil action by or against any corporation upon the ground that it was incorporated by or under an Act of Congress, unless the United States is the owner of more than one-half of its capital stock."

[24] See *Gully* v. *First Nat. Bank,* 299 U. S. 109, 113.

in jurisdiction over cases "arising under the laws of the United States" beyond that which traditional "federal question" theory recognizes.[25]

3. In an effort to avoid these problems, lower federal courts have given discordant answers. Most have ascribed to § 301 the creation of "substantive federal rights" or the subjection of collective agreements to a body of federal common law.[26] We must, of course,

---

[25] For some of the views advanced concerning the power of Congress to confer jurisdiction despite the absence of any "federal question" in the traditional sense, see *National Mutual Ins. Co.* v. *Tidewater Transfer Co.*, 337 U. S. 582, 600; *Textile Workers Union* v. *American Thread Co.*, 113 F. Supp. 137; Hart and Wechsler, The Federal Courts and the Federal System, 744–747; Wechsler, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp. Prob. 216, 224; Mishkin, The Federal "Question" in the District Courts, 53 Col. L. Rev. 157, 184.

[26] At least one federal court has held that state law is to be applied, perhaps on the theory of federal incorporation of state law as federal law. *Insurance Agents' International Union* v. *Prudential Ins. Co.*, 122 F. Supp. 869; see *Textile Workers Union* v. *American Thread Co.*, 113 F. Supp. 137, 140 (suggestion of such a possibility). Cf. *International Woodworkers* v. *McCloud River Lumber Co.*, 119 F. Supp. 475 (state law applied where jurisdiction was based on diversity as well as § 301); *Isbrandtsen Co.* v. *Local 1291*, 107 F. Supp. 72, aff'd 204 F. 2d 495 (diversity again present; on appeal, federal and state law found to be the same and question of applicable law avoided); *John Hancock Mutual Life Ins. Co.* v. *United Office & Professional Workers*, 93 F. Supp. 296 (removal to federal court denied on ground that even if § 301 gives federal rights, the complaints were framed with reference solely to state law).

Most federal courts, however, hold that § 301 created federal substantive rights and, when called upon to choose between state and federal law, apply the latter. *E. g., United Electrical, Radio & Machine Workers* v. *Oliver Corp.*, 205 F. 2d 376; *Milk & Ice Cream Drivers & Dairy Employees Union* v. *Gillespie Milk Products Corp.*, 203 F. 2d 650; *Shirley-Herman Co.* v. *International Hod Carriers Union*, 182 F. 2d 806; *International Plainfield Motor Co.* v. *Local 343*, 123 F. Supp. 683; *Waialua Agr. Co.* v. *United Sugar Workers*, 114 F. Supp. 243; *Ludlow Mfg. & Sales Co.* v. *Textile Workers Union*,

defer to the strong presumption—even as to such technical matters as federal jurisdiction—that Congress legislated in accordance with the Constitution. Legislation must, if possible, be given a meaning that will enable it to survive. This rule of constitutional adjudication is normally invoked to narrow what would otherwise be the natural but constitutionally dubious scope of the language. *E. g., United States* v. *Delaware & Hudson Co.*, 213 U. S. 366; *United States* v. *Rumely*, 345 U. S. 41. Here the endeavor of lower courts has resulted in adding to the section substantive congressional regulation even though Congress saw fit not to exercise such power nor to give the courts any concrete guidance for defining such regulation.

To be sure, the full scope of a substantive regulation is frequently in dispute and must await authoritative determination by courts. Congress declares its purpose imperfectly or partially and the judiciary rounds it out compatibly. But in this case we start with a provision which is wholly jurisdictional and as such bristles with consti-

108 F. Supp. 45; *Pepper & Potter, Inc.* v. *Local 977*, 103 F. Supp. 684; *Fay* v. *American Cystoscope Makers, Inc.*, 98 F. Supp. 278; *Textile Workers Union* v. *Aleo Mfg. Co.*, 94 F. Supp. 626; *Wilson & Co.* v. *United Packinghouse Workers*, 83 F. Supp. 162; *Colonial Hardwood Flooring Co.* v. *International Union*, 76 F. Supp. 493, aff'd 168 F. 2d 33; *International Union* v. *Dahlem Const. Co.*, 193 F. 2d 470 (semble) ; see *Rock Drilling, Local Union No. 17* v. *Mason & Hanger Co.*, 217 F. 2d 687, 691; *Schatte* v. *International Alliance*, 182 F. 2d 158, 164. Cf. *Textile Workers Union* v. *Arista Mills Co.*, 193 F. 2d 529 (refusal to pass on whether substantive federal rights created; federal law apparently viewed as applicable to issue raised in any event).

At least two courts have drawn a distinction between the law to be applied to matters of "substantive right" and "remedy." *Hamilton Foundry & Machine Co.* v. *International Molders Union*, 193 F. 2d 209 (federal rights created but state statute of frauds applied); *Textile Workers Union* v. *American Thread Co.*, 113 F. Supp. 137 (whether or not federal law applies to other matters, federal law regarding enforcement of arbitration clauses applies).

454

tutional problems under Article III. To avoid them, interpolation of substantive regulation has been proposed. From what materials are we to draw a determination that § 301 is something other than what it clearly appears to be? The problem is particularly vexing in view of the very difficult choice of policy that the alternatives of state or federal law present and the uncertainty as to the consequences of the choice. Is the Court justified in creating all these difficult problems of choice in matters of delicate legislative policy without any direction from Congress and merely for the sake of giving effect to a provision which seems to deal with a different subject? How far are courts to go in reshaping or transforming the obvious design of Congress in order to achieve validity for something Congress has not fashioned? In the words of Mr. Justice Cardozo, speaking for the whole Court: "We think the light is so strong as to flood whatever places in the statute might otherwise be dark. Courts have striven mightily at times to canalize construction along the path of safety. . . . When a statute is reasonably susceptible of two interpretations, they have preferred the meaning that preserves to the meaning that destroys. . . . 'But avoidance of a difficulty will not be pressed to the point of disingenuous evasion.' . . . 'Here the intention of the Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power.'" *Hopkins Federal Savings & Loan Assn.* v. *Cleary,* 296 U. S. 315, 334–335.

But assuming that we would be justified in proceeding further, the suggestion that the section permits the federal courts to work out without more a federal code governing collective bargaining contracts does not free us from difficulties.

Such a task would involve the federal courts in multiplying problems which could not be solved without disclosing that Congress never intended to raise them.

Application of a body of federal common law would inevitably lead to one of the following incongruities: (1) conflict in federal and state court interpretations of collective bargaining agreements; (2) displacement of state law by federal law in state courts, not only in actions between union and employer but in all actions regarding collective bargaining agreements; or (3) exclusion of state court jurisdiction over these matters. It would also be necessary to work out a federal code governing the interrelationship between the employee's rights and whatever rights were found to exist in the union. Moreover, if the general unfolding of such broad application of federal law were designed, the procedural objectives of Congress would have been accomplished without the need of any special jurisdictional statute. Federal rights would be in issue, and, under 28 U. S. C. § 1331 and Federal Rule 17 (b), the suit could be brought in any district court by or against the union as an entity. The only effect of § 301 would then be to dispense with the requirement of amount in controversy and to adopt certain other minor procedural rules.

It has been suggested that a more modest role might be assigned to federal law. The suggestion is that, in view of the difficulties which originally plagued the courts called upon to identify the nature of the legal relations created by a collective contract [27] and in view of the gener-

---

[27] The collective agreement was variously viewed as: (1) the mere formulation of usage or custom relevant to the interpretation of the individual employment contract; (2) a contract between the employer and the individual member-employees, negotiated by the union as the employees' agent; (3) a contract between the union and employer for the benefit of the individual employees; and (4) as held by the court below, a contract between the union and employer giving the union certain rights, including the right to insist that the employer contract with his employees consistently with the terms of the agreement, but giving the union no right to enforce obligations running to individuals under their contracts of hire.

alized statements in the legislative history of § 301 in favor of enforceability of collective agreements, § 301 may be viewed as a congressional authorization to the federal courts to work out a concept of the nature of the collective bargaining contract, leaving detailed questions of interpretation to state law.

This is an excessively sophisticated attribution to Congress. Evidence is wholly wanting that Congress was aware of the diverse views taken of the collective bargaining agreement or, in any event, that they were interfering with any federal objective. Moreover, once the right of the union to enter into contracts is granted by state law, these problems are really questions of interpretation of the language of ambiguously drawn contracts. If federal law undertook to resolve these ambiguities, it would become inextricably involved in questions of interpretation of the language of contracts. Discrepancies between federal and state court treatment, while not so inevitable as where federal law undertook the entire task of interpretation, would result. And any difference between state and federal theories of enforceability would present opportunities for forum-shopping.

To turn § 301 into an agency for working out a viable theory of the nature of a collective bargaining agreement smacks of unreality. Nor does it seem reasonable to view that section as a delivery into the discretionary hands of the federal judiciary, finally of this Court, of such an important, complicated and subtle field. These difficulties may be illustrated by a discussion of the holding of the Court of Appeals in the present case. Its "eclectic theory" of the nature of a collective agreement has no support in the statute, and, on the contrary, it is in some ways repugnant to it. (1) For example, the National Labor Relations Act seeks in § 9 (a) to preserve the "right" of an individual employee to take up grievances with his employer; but no one has ever suggested

that these grievances may not be taken up by the union. (2) It excludes from the court stage the party that is recognized in the required preliminary stages. The union that is empowered to negotiate and settle the controversy before suit is barred from bringing suit when settlement is not reached. (3) This would tend to impair the union's power to negotiate a mutually satisfactory settlement. As a practical matter, the employees expect their union not just to secure a collective agreement but more particularly to procure for the individual employees the benefits promised. If the union can secure only the promise and is impotent to procure for the individual employees the promised benefits, then it is bound to lose their support. And if the union cannot ultimately resort to suit, it is encouraged to resort to strike action.

Perhaps the prime example of an individual cause of action, as distinguished from a union cause, under the Court of Appeals' "eclectic theory," would be the case of the discharge of a single employee. To make the situation vivid, assume that there is no dispute whatever as to the propriety of the alleged ground for the discharge and that the only matter in controversy is the question of fact whether the employee did or did not commit the offense alleged. Yet precisely such incidents often pull the trigger of work stoppages. When stoppages do occur, they most frequently involve a grievance with respect to one employee or a few employees much smaller in number than those involved in the stoppage. That such stoppages are wildcat and officially unauthorized merely emphasizes the fact of group interest in the incident. It is a matter of industrial history that stoppages of work because of disciplinary penalties against individuals, or because of failure to pay the rates claimed, or because of the promotion or layoff of one employee rather than another, or for similar reasons, have been frequent occurrences. A legal rule denying standing to the union to

protect individual rights under what is to be deemed a contract with individuals would encourage such indiscipline. And this is true even though the ultimately desirable social policy is to make it a matter of industrial habit to rely for a remedy for such grievances not on stoppage of work or on lawsuits but on the grievance procedure within an industry. There is in fact a strong group interest in procuring for the employee the benefit promised as well as the promise in the collective agreement. If the union can represent and press that group interest, the stoppage may be avoided; if it cannot, the group resorts to wildcat self-help. The holding below cannot eliminate this group interest; it can stimulate its manifestation by way of a strike.

Is the line which the Court of Appeals has drawn the result of interpretation of the particular contract or of a rule of law beyond the power of the parties to alter? If it is the former, then the line can be obliterated by express language in the contract; and the unions can be trusted to find suitable language. They were quick to secure amendment to their constitutions or statutes in order to avoid the decision of this Court in *Elgin, Joliet & Eastern R. Co.* v. *Burley,* 325 U. S. 711, 327 U. S. 661.[28] If it is the latter, what is the basis for the rule? It is not to be found in fear that the employee

---

[28] The Brotherhood of Locomotive Engineers amended their Standing Rules to provide for automatic consent of all members to the Brotherhood's prosecution of grievances at their Tenth Triennial Convention in March and April 1947. The Brotherhood of Locomotive Firemen and Enginemen added a similar provision to their Constitution at their 35th Convention in 1947. The Order of Railway Conductors and Brakemen amended their "statute" in a similar fashion in 1946. The Brotherhood of Railroad Trainmen at their 1946 Convention adopted a new General Rule which empowered the Brotherhood to prosecute grievances "Except in individual cases where the member or members involved serve seasonable written notice on the Brotherhood to the contrary."

may not be able to sue.   To hold that the union may sue, it is not necessary to hold that the employee may not sue in any forum, and vice versa.   At least when the union and the employee are in agreement, there is no reason why either or both should not be permitted to sue.   Such is the situation under § 9 (a) of the National Labor Relations Act with respect to the adjustment of grievances without suit.   When the employee and the union are in disagreement, the question is not which may sue, but rather the extent to which the one may conclude the other.

Speculative reflection reveals other possible substantive additions which might be made to § 301.   When tested against the limitations which must restrict judicial elaboration of legislation, however, all meritorious possibilities are either too specialized to reach this case or too insignificant an addition to dissipate the constitutional doubts which have revealed themselves.

4. In the present case, however, serious constitutional problems may be avoided, and indeed must be, through the orthodox process of limiting the scope of doubtful legislation.   We cannot adopt the reasoning of the Court of Appeals in reaching our conclusion that § 301 does not extend jurisdiction to the present case.   That court relied upon an assumed federal concept of the nature of a collective bargaining agreement which is not justified either in terms of discoverable congressional intent or considerations relevant to the function of the collective agreement in the field of labor relations.   The same objections do not, however, prevail against the view that whether or not the applicable substantive law—in our view state law— would recognize a right in the union, Congress did not intend to burden the federal courts with suits of this type.

Considering the nature of a collective bargaining contract, which involves the correlative rights of employer,

employee *and* union, we might be disposed to read § 301 as allowing the union to sue in this case. With due regard to the constitutional difficulties which would be raised, and in view of the fact that such an interpretation would bring to the federal courts an extensive range of litigation heretofore entertained by the States, we conclude that Congress did not will this result. There was no suggestion that Congress, at a time when its attention was directed to congestion in the federal courts, particularly in the heavy industrial areas, intended to open the doors of the federal courts to a potential flood of grievances based upon an employer's failure to comply with terms of a collective agreement relating to compensation, terms peculiar in the individual benefit which is their subject matter and which, when violated, give a cause of action to the individual employee. The employees have always been able to enforce their individual rights in the state courts.[29] They have not been hampered by the

---

[29] For examples of such suits by employees in state courts prior to 1947, when the Taft-Hartley Act was passed, see *Gulla* v. *Barton,* 164 App. Div. 293, 149 N. Y. Supp. 952; *H. Blum & Co.* v. *Landau,* 23 Ohio App. 426, 155 N. E. 154; *Mastell* v. *Salo,* 140 Ark. 408, 215 S. W. 583; *McGregor* v. *Louisville & N. R. Co.,* 244 Ky. 696, 51 S. W. 2d 953; *O'Jay Spread Co.* v. *Hicks,* 185 Ga. 507, 195 S. E. 564 (class suit); *Rentschler* v. *Missouri Pac. R. Co.,* 126 Neb. 493, 253 N. W. 694; *Volquardsen* v. *Southern Amusement Co.,* 156 So. 678 (La. App.); *Yazoo & M. V. R. Co.* v. *Sideboard,* 161 Miss. 4, 133 So. 669; *Cross Mountain Coal Co.* v. *Ault,* 157 Tenn. 461, 9 S. W. 2d 692; and *Hall* v. *St. Louis-San Francisco R. Co.,* 224 Mo. App. 431, 28 S. W. 2d 687. See also *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630; *J. I. Case Co.* v. *Labor Board,* 321 U. S. 332, 336; I Teller, Labor Disputes and Collective Bargaining (1940, 1947 Cum. Supp.), §§ 166–168; II Williston, Contracts (rev. ed. 1936), § 379A.

And such suits are still being entertained. *E. g., Dufour* v. *Continental Southern Lines, Inc.,* 219 Miss. 296, 68 So. 2d 489; *Donahoo* v. *Thompson,* 270 S. W. 2d 104; *Marranzano* v. *Riggs Nat. Bank,* 87 U. S. App. D. C. 195, 184 F. 2d 349; *MacKay* v. *Loew's, Inc.,* 182 F. 2d 170 (diversity case); II Williston, Contracts, § 379A (1954 Cum. Supp.).

rules governing unincorporated associations. To this extent, the collective bargaining contract has always been "enforceable."

Nowhere in the legislative history did Congress discuss or show any recognition of the type of suit involved here, in which the union is suing on behalf of employees for accrued wages. Therefore, we conclude that Congress did not confer on the federal courts jurisdiction over a suit such as this one.

*Affirmed.*

Mr. Justice Harlan took no part in the consideration or decision of this case.

Mr. Chief Justice Warren, with whom Mr. Justice Clark joins, concurring.

We agree with the decision but not with all that is said in the opinion. The only question we see here is one of statutory interpretation. For us the language of § 301 is not sufficiently explicit nor its legislative history sufficiently clear to indicate that Congress intended to authorize a union to enforce in a federal court the uniquely personal right of an employee for whom it had bargained to receive compensation for services rendered his employer. Thus viewed, it becomes unnecessary for us either to make labor policy or to raise constitutional issues.

Mr. Justice Reed, concurring.

My analysis of this case leads me to concur on grounds stated later without the extensive comment and broad treatment given by the opinion of Mr. Justice Frankfurter.

What is there said as to the substantive law to be applied in § 301 actions will be pertinent in cases which are deemed to have been properly brought under that section—that is, where there is set forth the

violation of a collective bargaining agreement based on the failure of either the employer or the union to carry out its undertakings with the other. It is appropriate therefore for me to state my views as to the law which will be applied in those actions and in so doing to express my disagreement with the constitutional doubts raised by the opinion of MR. JUSTICE FRANKFURTER.

Assuming that the purpose of § 301 was to make unions suable as if corporations, with provisions for venue and service, it also gave jurisdiction to federal district courts over certain matters related to interstate commerce and thus within the legislative powers of Congress. *Labor Board Cases*, 301 U. S. 1. The Labor Management Relations Act, 1947, is directed primarily to federal regulation of labor relations affecting commerce through the means of collective bargaining. While all contract questions that may arise in § 301 actions are not covered by the federal statute, the Act furnishes some substantive law which will be applied in those cases. It sets forth guiding principles which will bear on contracts made under it, and it also controls the machinery for reaching those agreements. It points out many things the parties may or may not do in commerce, just as other Acts, such as the Interstate Commerce Act, do. Thus the contracts sued upon in § 301 actions will have been entered into in accordance with federal law; and although federal law does not set forth explicitly just what constitutes a breach, § 301, by granting federal jurisdiction over actions between employers and unions on collective bargaining contracts, does make breaches of them by either of those parties actionable. The fact that unions may make contracts under state law does not bar the Federal Government from legislation in its field. In case of conflict, federal law prevails. It is as true in federal laws as it is in state laws that the power to enact gives power to interpret. *Jones* v. *Prairie Oil Co.*, 273 U. S. 195, at 200.

It may be that in proper litigation under § 301 it will be necessary for federal courts to draw largely on state law for the solution of issues. In such instances state law is relied upon because its application is not contrary to federal policy, but supplements and fulfills it. *Board of Comm'rs* v. *United States,* 308 U. S. 343, 351. It has been held that a suit in equity on a federal right in a federal court does not necessarily follow a state statute of limitation. *Holmberg* v. *Armbrecht,* 327 U. S. 392. The general rule is that federal interpretation controls a federal act. *Jerome* v. *United States,* 318 U. S. 101, 104.

The fact that a considerable amount of state law may be applied in suits under § 301 should not affect the validity of the statute. This Court sustained the jurisdictional grant of § 23 (a) of the Bankruptcy Act, 44 Stat. 664, despite the fact that causes of action brought thereunder were created and governed solely by state law. *Schumacher* v. *Beeler,* 293 U. S. 367; *Williams* v. *Austrian,* 331 U. S. 642. See also *Osborn* v. *Bank of the United States,* 9 Wheat. 738, and *Pacific Railroad Removal Cases,* 115 U. S. 1, 11. Cf. the Federal Tort Claims Act. Since Congress has legislative power over labor matters affecting interstate commerce, it may grant jurisdiction to the federal courts to try incidents of that activity that raise legal issues, and dictate what law should be applied. The application of federal law raises no constitutional problem. If state law is to be applied, it is state law operating at the direction of and by the permission of Congress. State law is, in effect, incorporated by reference. Since the contract entered into through provisions of the Labor Act creates rights over which Congress has legislative authority, a breach of the contract is likewise within its power. Congress by § 301 has manifested its purpose to vest jurisdiction over breaches, to a certain extent, in the federal courts. Whether the rules of substantive law applied by the federal courts are derived from federal

or state sources is immaterial. The rules are truly federal, not state. The cause of action for breach of contract is thus a cause of action arising under federal law, the source of federal judicial power under Art. III of the Constitution.

From the recognition of the power of Congress to regulate matters affecting commerce in *Houston & Texas R. Co.* v. *United States* (The Shreveport Doctrine), 234 U. S. 342, 351 (1914), to *Labor Board Cases*, 301 U. S. 1 (1937), questions as to the power of Congress over local incidents of national commerce plagued advocates of legal changes with doubts as to the constitutional power of Congress to regulate labor relations effectually. With the full recognition of the integration of the local with the national, the power to use national authority in commerce, when needed, was established. I see no occasion, at this late date, to allow the fog of another day to obscure the national interest in these problems—this time by reason of Article III of the Constitution. Cf. subdivision 2 of MR. JUSTICE FRANKFURTER's opinion.

The reason, I think, that this union cannot recover from the employer in this suit under § 301 is that the claim for wages for the employees arises from separate hiring contracts between the employer and each employee. The union does not undertake to do work for the employer or even to furnish workers. The duty, if any there be, to pay wages to an employee arises from the individual contract between the employer and employee, not from the collective bargaining agreement. Therefore there is set out no violation of a contract between an employer and a labor organization as is required to confer jurisdiction under § 301. The facts show an alleged violation of a contract between an employer and an employee—a situation that is not covered by the statute.

The interpretation contained in the preceding paragraph conforms to the words of the section and avoids sug-

gesting constitutional limitations that would cripple the creation of a national system for the enforcement of statutes concerning labor relations.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK concurs, dissenting.

I agree with MR. JUSTICE REED that Congress in the Taft-Hartley Act created federal sanctions for collective bargaining agreements, made the cases and controversies concerning them justiciable questions for the federal courts, and permitted those courts to fashion from the federal statute, from state law, or from other germane sources, federal rules for the construction and interpretation of those collective bargaining agreements.

My dissent is from the refusal of the majority to allow the union standing to bring this suit. The complaint alleged that by reason of a collective bargaining agreement the employer was obligated to pay each employee, whom the union represents, his full salary during April 1951, regardless of whether he missed a day's work, unless the employee's absence was due to "furlough" or "leave of absence." The complaint further alleged that the employer had violated the collective bargaining contract by deducting from the pay of some 4,000 employees their wages for April 3 on account of their absence, that absence not being a "furlough" or "leave of absence" within the meaning of the collective bargaining agreement. The union requested a declaration of rights under the collective bargaining agreement. Though the employees affected were not parties to the suit, the complaint prayed for an accounting of the amount owed each employee and a judgment in favor of the individual employees for the unpaid wages.

We make mountains out of molehills in not allowing the union to be the suing as well as the bargaining agency for its members as respects matters involving the con-

struction and enforcement of the collective bargaining agreement. Individual contracts of employment result from each collective bargaining agreement. But those contracts are the resultant of the collective bargaining system, a system that continues to function and operate after the contracts are made. The concept of collective bargaining contained in the statute (29 U. S. C. § 159 (a)) includes, of course, the negotiation of the collective agreement and the settling of the terms of the individual contracts. But the collective bargaining relationship does not end there. To be sure, the Taft-Hartley Act provides that there shall be no changes in the provisions of the agreement during its term, 29 U. S. C. § 158 (d). But that does not mean that the collective bargaining agent drops out of the picture once the agreement is made. We know enough of trade-union practices to know that the advent of collective bargaining has produced a permanent, organized relationship between the union and the employer, involving a day-to-day administration of the collective agreement. The Act indeed extends the right of collective bargaining that far. For it specifically provides that ". . . to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, *or any question arising thereunder . . . ,*" 61 Stat. 142, 29 U. S. C. § 158 (d) (italics added).

The processing of grievances is recognized by the Act as a function which the labor organization performs or may perform. For 29 U. S. C. § 152 (5) defines "labor organization" as an agency which deals with employers, *inter alia,* "concerning grievances." As the National Labor Relations Board stated in *Hughes Tool Co.,* 104 N. L. R. B. 318, 326, "The adjustment of grievances,

viewed in the larger aspect, constitutes, to a great degree, the actual administration of a collective-bargaining contract."

The administration of the collective agreement is its life and meaning. The adjustment and settlement of grievances, the development of an administrative practice concerning the collective agreement give it force and authority.

The right of individual employees to present their own grievances is recognized by the Act. 29 U. S. C. § 159 (a). But even when they desire to speak for themselves, rather than through the union, Congress attached two important conditions. *First,* any adjustment of the individual grievance must not be "inconsistent with the terms of a collective-bargaining contract or agreement then in effect." *Second,* the union must be given "opportunity to be present at such adjustment." *Id.*

It is plain, I think, that the grievance procedure is a part of the collective bargaining process. And a lawsuit is one of the ultimates of a grievance. A lawsuit, like negotiation or arbitration, resolves the dispute and settles it.

In short, the union represents the interests of the community of employees in the collective bargaining agreement. The wide range of its interests are envisaged by the Act, which gives the collective bargaining agency exclusive authority to bargain "in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U. S. C. § 159 (a). The range of its authority is the range of its interests. What the union obtains in the collective agreement it should be entitled to enforce or defend in the forums which have been provided. When we disallow it that standing, we fail to keep the law abreast of the industrial developments of this age.