GARFIELD LOCAL 13–566 OIL, CHEMI-CAL AND ATOMIC WORKERS IN-TERNATIONAL UNION, AFL–CIO, Emory A. Wenzel and Rudolph J. Wenzel, Plaintiffs,

v.

HEYDEN NEWPORT CHEMICAL COR-PORATION and The Equitable Life Assurance Society of the United States, Defendants.

Civ. A. No. 588–58.

United States District Court
D. New Jersey.
April 9, 1959.

Bracken & Walsh, Newark, N. J., for plaintiffs.

Shanley & Fisher, Newark, N. J., for defendant Heyden Newport Chemical Corp.

Emory, Langan, Lamb & Blake, Jersey City, N. J., for Equitable Life Assur. Soc. of the United States.

MORRILL, District Judge.

This suit is by a union and by two certain officer members thereof in their individual capacities and as representatives of a class. The class consists of those members of the union who are participants in the pension plan in question.

The employer-defendant Heyden arranged a pension plan for its employees through the insurer-defendant Equitable. Concededly, this plan was voluntary, in the sense that employees of Heyden could subscribe to it or withdraw from it at their will. Subsequently, the Union and Heyden entered into a collective bargaining agreement which covered certain of Heyden's employees but did not cover other employees hereinafter designated as salaried employees. Prior to this agreement, some employees of both classes, salaried and non-salaried, were participants in the pension, numbered AC–512. The agreement provided that Heyden's "presently existing Pension Plan * * * shall be continued in force * * * during the life of this Agreement."

■■ Later, 101 salaried employees withdrew from plan AC–512 [1] and joined a newly formed pension plan through Equitable, AC–1399,[1] which covered salaried employees. Plan AC–512 provided that accumulated reserves attributable to withdrawing participants could be transferred.

In Count One, the Union, alleging that the creation of the new plan involved the removal of over $670,000 from the reserves held by Equitable for plan AC–512 and amounted to a breach of the collective bargaining agreement to keep AC–512 "in force," seeks specific performance of this agreement by compelling Heyden to restore "the said pension plan to its original form and content and to keep it in force," and for the restoration of the reserves.

In Count Two, the individual plaintiffs, alleging that they contributed to the original plan "under an agreement involving as consideration the making of similar contributions from Heyden New-

1. AC–512 is technically known as a group deferred annuity contract. An employee contributes a designated percentile unit of his salary, matched by the employer, to purchase a separate unit of annuity each year. AC–1399 is a deposit administration contract whereby payments are accumulated at interest until retirement age when they are used to purchase a complete annuity.

port and all other employees of defendant Heyden Newport, over a period of years, by which the plan was made safer, more economical and potentially capable of further improvement," and that the creation of the new (and allegedly better) plan discriminated against the non-salaried employees, seek the same relief but as against both defendants.

The defendants move for summary judgment on both counts.

## Count One

This count is brought by the Union "under and by virtue of the provisions of 29 U.S.C.A. § 185(a)," being § 301 of the Labor-Management Relations Act (Taft-Hartley), which provides that "suits for violation of contracts between an employer and a labor organization * * * may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." At the hearing, counsel for the Union confirmed that the action was rooted in § 301, with specific performance being an allowable remedy under that section as decided by Independent Petroleum Workers of New Jersey v. Esso Standard Oil Company, 3 Cir., 1956, 235 F.2d 401. Although the collective bargaining agreement called for an arbitration procedure for grievances, such relief was not sought. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 923, 1 L.Ed.2d 972.

In Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510, which involved an interpretation of a collective bargaining agreement about payment of wages for a day of absence, the opinion of Justice Frankfurter, announcing the decision, stated that Congress did not intend by § 301 "to open the doors of the federal courts to a potential flood of grievances based upon an employer's failure to comply with the terms of a collective agreement relating to compensation, *terms peculiar in the individual benefit which is their*

*subject matter* and which, when violated, give a cause of action to the individual employee." 348 U.S. at page 460, 75 S.Ct. at page 500. (Emphasis supplied.) He concluded that Congress did not confer on the federal courts jurisdiction over that type of suit.

Concurring, the Chief Justice stated there was no evidence of Congressional intent "to authorize a union to enforce in a federal court the *uniquely personal right* of an employee for whom it had bargained to receive compensation for services rendered his employer." 348 U.S. at page 461, 75 S.Ct. at page 501. (Emphasis supplied.)

It is to be noted that in Westinghouse, a motion to dismiss was made in the District Court on the merits and for lack of jurisdiction. The court denied the motion on the latter ground but granted it on the first ground. D.C., 107 F.Supp. 692. The Court of Appeals vacated the order and directed dismissal for lack of jurisdiction. 3 Cir., 210 F.2d 623.

The Westinghouse case was keenly analyzed by Judge Hastie in United Steelworkers v. Pullman-Standard Car Mfg. Co., 3 Cir., 1957, 241 F.2d 547. Involved there was interpretation of a collective bargaining agreement regarding a pension clause. It was held that pension provisions of a collective bargaining agreement come within the scope of the Westinghouse rule. "Certain undertakings of the employer are important because of their direct and primary effect upon the union as an organization. Undertakings to maintain a union shop and to check off union dues are typical of this category. Breaches of such undertakings so primarily concern the union that it may meaningfully be said that the resulting claims are not 'uniquely personal' to the employees." At page 551.

It would seem, therefore, that I have no choice but to deny the motion for summary judgment on Count One and enter an order for dismissal for lack of jurisdiction insofar as Count One rests on § 301.

The Union now contends, however that even if dismissal is impelled by the above reasoning, the complaint also alleges the necessary diversity and amount in controversy to give this court jurisdiction under 28 U.S.C.A. § 1332, and that Count One should stand as an ordinary equity suit for specific performance without regard to § 301 of the Taft-Hartley Act. 29 U.S.C.A. § 185. This the court will allow, under F.R.Civ.P. 8(f), 28 U.S.C.A., but there still remains the problem of jurisdiction under § 1332. Of course, with jurisdiction assumed on the basis of diversity, the law of New Jersey governs, Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, and this court sits, in effect, only as another court of New Jersey, Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079. Thus, the following cases become applicable: Christiansen v. Local 680, Milk Drivers, etc., 1940, 126 N.J.Eq. 508, 10 A.2d 168, Dooley v. Lehigh Valley R. Co., 1941, 130 N.J.Eq. 75, 21 A.2d 334, and Milk Drivers & Dairy Employees, Local 680 v. Cream-O-Land Dairy, 1956, 39 N.J. Super. 163, 120 A.2d 640.

This court is not bound by the pleadings of the parties as to the amount in controversy. It may, on its own motion, if led to believe that its jurisdiction is not properly invoked, inquire into the facts as they really exist. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135; Ambassador East, Inc. v. Orsatti, Inc., 3 Cir., 1958, 257 F.2d 79.

The affidavits and briefs submitted by the parties provide sufficient facts for a proper determination. The Union argues that "plainly put, the union wanted to have a veto on any pension plan change to give it an advantage in bargaining," and that "this provided the union with a very important collective bargaining weapon which by negotiation of subsequent contracts could tie improvement of the whole insurance scheme

of the company to a threat of strike or other economic reprisal." The Union conceded that if the 101 salaried workers withdrew from plan AC–512 and joined a new plan with a *different* insurance carrier there would be no cause for grievance; likewise, if they joined plan AC–1399 and the existing reserves remained intact. Furthermore, the Union admitted that "nobody will get less insurance as the result of the severance of union and non-union insurance contracts."

As to the reserves, a vice-president and associate actuary of Equitable deposed in part as follows:

"With respect to the statement that defendants removed $671,642.-00 from the reserve held by defendant Equitable in Contract No. AC 512, what was done at that time was that the purchase payments made by the employer for the employees who were transferring to Contract No. AC 1399 were transferred as a credit to the purchase payment fund provided for under Contract No. AC 1399. While it is true that there are reserves for all insurance and annuity contracts issued by the Equitable, there is no specific reserve fund for any particular annuity contract or insurance policy. The general credit of the Equitable is pledged for all annuity contracts and insurance policies issued by the Equitable.

"The annuity benefits of the members of plaintiff local under Annuity Contract No. AC 512 have not been affected in the least by the transferring of certain employees to the deposit administration contract No. AC 1399."

This was not contradicted.

With the diversity statute to be strictly construed, Thomson v. Gaskill, 315 U.S. 442, 62 S.Ct. 673, 86 L.Ed. 951, it is difficult to find here a controversy in the amount of $3,000.[2] The value of

---

2. This suit was instituted prior to the recent amendment to 28 U.S.C.A. § 1332.

July 25, 1958, Pub.L. 85–554, 72 Stat. 415.

the asserted bargaining weapon, assuming that the collective bargaining agreement granted such a weapon, is at best nebulous and hardly measurable in terms of dollars. Additionally, if the rights under that agreement are uniquely personal to the employees and not to the Union, there are no rights to be valued. As to the removed reserves, the Union did not have a right to have them earmarked for plan AC–512, especially in view of the voluntariness of the plan and the concessions by the Union heretofore adverted to. In any event, the reserves do not constitute the item to be measured for they are merely collateral or incidental to the central issue of whether or not Heyden broke its contract with the Union. Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248. And the plaintiff has the burden of proving jurisdictional facts. Electro Therapy Products Corporation v. Strong, 9 Cir., 1936, 84 F.2d 766. I would dismiss Count One for lack of jurisdiction even if the case is regarded as resting on diversity grounds.

Additionally, there is the question of whether the plaintiff Union has the capacity to sue here. The Union is an unincorporated association and its capacity to sue is determined by the law of New Jersey. F.R.Civ.P. 17(b), 28 U.S.C.A.; Underwood v. Maloney, 3 Cir., 1958, 256 F.2d 334. N.J.S.A. 2A:64–1 provides that "Any unincorporated * * association * * * may sue * * * by such name in any civil action affecting its common property, rights and liabilities * * *." Such association may not sue upon rights owned individually by its members even though there are common questions of law and the same relief is sought. New Jersey Bankers' Association v. Van Riper, 1948, 1 N.J. 193, 62 A.2d 677, 679. As Chief Justice Vanderbilt said in that case: "This action is not concerned with the common property of the plaintiff, if indeed it has any; it has to do solely with the validity of certain acts which deal with the correlative rights and liabilities of banking institutions of this State, their respective depositors of unclaimed moneys, and the State, to which such unclaimed deposits have been paid. Manifestly, the unclaimed funds which were deposited with its member banks are not the property of the plaintiff association, nor is it possessed of any rights or chargeable with any liabilities with respect to such deposits. In the case of the member banks themselves, the character of their rights and liabilities with regard to the unclaimed deposits is several and distinct, not common or joint. True, questions of law common to each of the member banks are presented and common relief may be said to be sought in this suit, but such community of purpose and unity of legal question does not constitute the proceeding one affecting the 'common property, rights and liabilities' of either the plaintiff association or its individual members." 1 N.J. at page 196, 62 A.2d at page 679. Since the rights of the Union members are "uniquely personal" to them, Westinghouse and Pullman-Standard, supra, the rights are not the common rights of the Union and under the statute it may not sue in its own name.

To avoid a remand with a direction by "other minds" to rule on the motions for summary judgment on the merits, I state my position on that in advance. If I held there was jurisdiction in this court, I would grant summary judgment in Count One on the merits in favor of the defendant. The rights involved, if any, being uniquely personal to the union employees, the collective bargaining agreement and the alleged breach thereof created no right in the Union. Even if the "uniquely personal" rule is not applied, the defendant had no duty to the Union which was violated. The defendant did not promise to keep the pension plan intact; it merely promised to keep it *in force* and, since it is conceded that the collective bargaining agreement covered only the union employees, to keep it in force as to such employees only. The plan is in fact in force and even intact *as to such em-*

*ployees,* insofar as financial benefits and security are concerned.

As to the reserves, it is at most a bookkeeping entry with no real harm or damage to the Union, and even if a cause of action could be spelled out, the most that can be spelled out by the Union by way of damages would be embraced by the phrase *injuria absque damno.*

### Count Two

Much of what is stated in the discussion as to Count One is applicable here. Additionally, one Janus filed an affidavit in behalf of the plaintiffs which stated in part: "In thus dividing salaried employees from wage employees, it was the purpose of the defendants to discriminate in favor of unorganized salaried employees and against wage employees." In view of the voluntary nature of the plan hereinbefore adverted to, this conclusion is untenable. There is nothing in the collective bargaining agreement which bound either defendant to bar a participant in plan AC–512 from withdrawing from that plan and entering another plan, or guaranteed union-member participants in AC–512 that they would be given the privilege of joining any new or different plan which might be created for non-union members. With the admission that the insurance coverage for the union-member participants remained the same after the severance, that alone would be sufficient to apply the phrase—*injuria absque damno,* even assuming that these plaintiffs and the class could properly aggregate their claims to supply the jurisdictional amount. If there is damage to the pension plan rights in terms of coverage, recovery should be sought at law; if specific performance was decreed, the court could not assure these defendants that the non-salaried participants in the plan would continue their membership in the plan; and if the salaried employees were restored to Plan AC–512, it is conceded that they could subsequently withdraw therefrom and that the reserves attributable to their participation would not have to remain intact. See Pomeroy, Equity Jurisprudence (5th ed.) § 1405b.

The monetary amounts involved in the claims of these plaintiffs admittedly do not add up to $3,000. It is the property right sought to be protected that governs this jurisdictional requisite. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 181, 56 S.Ct. 780, 80 L.Ed. 1135; KVOS, Inc. v. Associated Press, 299 U.S. 269, 277, 57 S.Ct. 197, 81 L.Ed. 183; Healy v. Ratta, 292 U.S. 263, 54 S.Ct. 700, 78 L.Ed. 1248. Individual causes of actions may not be lumped together to reach the required amount in controversy. As was said in Thomson v. Gaskill, 315 U.S. at page 447, 62 S.Ct. at page 675: "Aggregation of plaintiffs' claim cannot be made merely because the claims are derived from a single instrument, * * * or because the plaintiffs have a community of interest * * *. In a diversity litigation the value of the 'matter in controversy' is measured not by the monetary result of determining the principle involved, but by its pecuniary consequence to those involved in the litigation." These plaintiffs have not even pleaded or attempted to prove that their claims attain such amount. If there was a "spurious" attempt to claim a class action here on behalf of all the members of the union, dismissal would still follow. Black and Yates, Inc. v. Mahogany Ass'n, 3 Cir., 1942, 129 F.2d 227, 236, 148 A.L.R. 841 (on rehearing); Ames v. Chestnut Knolls, D.C.D.Del.1958, 159 F.Supp. 791.

The relief sought, if granted, would substantially affect the rights of the 101 salaried members who would be restored to the original Plan AC–512. No attempt has been made to join these indispensable parties, Nix v. Spector Freight System, 3 Cir., 1959, 264 F.2d 875, nor is it clear that if they were joined there would be the necessary diversity, Stein v. Brotherhood of Painters, etc., D.C.D.N.J.1950, 11 F.R.D. 153.

I would similarly grant summary judgment on Count Two. The material facts are not in dispute. Plan AC–512 is still "in force" as to all members of the union for whom it was to remain in force under the collective bar-

238

gaining agreement. No harm or damage to the plaintiffs is shown. The argument that the creation of the new plan constituted unfair discrimination against union members, relying on N.L.R.B. v. Roure-Dupont Mfg., 2 Cir., 1952, 199 F.2d 631 is not impressive. There, certain employees who repudiated the union were given bonuses. Here, the 101 salaried employees who withdrew from plan AC–512 were not members of the Union nor were they covered by the collective bargaining agreement. As well argue that the employer could not increase the earnings of these 101 salaried employees as say that a separate pension plan cannot be sponsored for such personnel.

Submit order for dismissal.