LOCAL 205, UNITED ELECTRICAL, RA-
DIO AND MACHINE WORKERS
OF AMERICA (UE)

v.

GENERAL ELECTRIC COMPANY.

Civ. A. No. 54–993.

United States District Court
D. Massachusetts.

March 31, 1959.

See also 172 F.Supp. 960.

54

Allan R. Rosenberg, Boston, Mass., for plaintiff.

Warren F. Farr, Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., for defendant.

ALDRICH, District Judge.

■ In this suit to compel arbitration, following the decision of the Supreme Court, 353 U.S. 547, 77 S.Ct. 921, 1 L.Ed.2d 1028,[1] part of the original de-

1. That decision did not address itself to the individual questions now before the court, but only to the broad issue of whether labor arbitration could be compelled by judicial action.

mands were agreed to and eliminated, and the plaintiff Union amended its complaint, adding a new claim. The original demands arose under 1953 and 1954 collective bargaining agreements. The new claim is based upon a grievance filed in October, 1957, after the Supreme Court decision, for asserted violation of the 1953 and 1954 and 1956 agreements. The only matter remaining from the original complaint relates to one Armstrong, discharged in 1954. A grievance was filed forthwith, questioning whether Armstrong, discharged for refusal to perform certain work, was discharged for sufficient cause, and the severity of the penalty. The grievance was processed, the Company standing by its action, and the Union's demand for arbitration refused. I will assume that if it was necessary for the company to have "good," "proper," etc., cause for discharge, there would be an arbitrable question. The Company's position in this court, however, is that since the agreement contains no express provision dealing with cause for discharges it could discharge for any cause or reason which appealed to it, and that the propriety of the discharge was therefore not arbitrable. It admits that the discharge was an appropriate matter for grievance, but says the two procedures are not co-extensive. The Union replies that if such a distinction is made, and the Company cannot be required to arbitrate, this would discriminate against the Union because the "no-strike clause prohibits strikes or any organized interference with work of any kind in connection with any matter subject to the grievance procedure." Were this statement accurate I might be receptive to the Union's conclusion. However, after the grievance process has been concluded, and there has been no resort to arbitration, the no-strike obligation terminates. Presumably, this also encompasses the situation in which arbitration is not available. Cf. Local 201, International Union of Electrical Workers, AFL-CIO v. General Electric Co., 1 Cir., 262 F.2d 265, 268. Hence defendant's position does not dis-

criminate. Plaintiff cites Fruit & Vegetable Packers Union v. Torvig Sealander Fruit Co., D.C.E.D.Wash., 160 F. Supp. 623, but there the court assumed, properly or otherwise, that the no-strike clause was applicable. That case is also easily distinguishable on another ground, since there the company's right to discharge was expressly limited.

■ Determination of what the parties have agreed to submit to arbitration is frequently difficult. In the case at bar the arbitration clause covers, with certain exceptions not at the moment material, "any matter involving the application or interpretation of any provisions of this Agreement * * *." If there are no provisions relating to the defendant's right to discharge, there is nothing to arbitrate. Local 201, etc. v. General Electric Co., supra. Conversely, if provisions do exist, the court will not refuse to submit the matter even though it is "crystal-clear" that the arbitrator could decide the merits only one way. New Bedford Defense Products Division of the Firestone Tire & Rubber Co. v. Local 1113, International Union, United Automobile Workers, AFL-CIO, 1 Cir., 258 F.2d 522, 526. However, this principle of "submission-though-there-be-no-ambiguity" comes into play only with respect to those issues which are in fact arbitrable. It can have no application when dealing with the preliminary questions which the court must decide for itself in order to determine whether the parties have in fact agreed to arbitrate. When dealing with an arbitration clause of the type here involved, the court must first determine that there is in the agreement a provision applicable to the dispute, that is, one which the arbitrator can use as a controlling statute. Local 201, etc., v. General Electric Co., supra, 262 F.2d at page 271. Unless there is some basis for saying that the parties addressed themselves in the agreement to the subject matter of the dispute, something on which at least a presentable case of relevancy and applicability can be made, the moving party is not entitled to an order, because he has not

**56**

shown that the parties contracted to arbitrate that dispute. If the moving party can make out such a case, then the ultimate decision as to the relevancy and applicability of the provisions should be left to the arbitrator. But a mere claim of arbitrability does not of itself create an arbitrable issue, unless the parties have agreed to arbitrate arbitrability itself. Local 201, etc. v. General Electric Co., supra, 262 F.2d at page 271. No one now asserts this special exception in the case at bar.[2]

■ Customarily it is management's right to hire and fire as it sees fit, unless by contract the parties have agreed to limitations on this right. United States Steel Corp. v. Nichols, 6 Cir., 229 F.2d 396, 399, certiorari denied, 351 U.S. 950, 76 S.Ct. 846, 100 L.Ed. 1474; Odell v. Humble Oil & Refining Co., 10 Cir., 201 F.2d 123, 128, certiorari denied, 345 U.S. 941, 73 S.Ct. 833, 97 L.Ed. 1367; Post Publishing Co. v. Cort, 334 Mass. 199, 206, 134 N.E.2d 431; cf. Goodall-Sanford, Inc., v. United Textile Workers, 1 Cir., 233 F.2d 104, 109–110 (dictum), affirmed, 353 U.S. 550, 77 S.Ct. 920, 1 L.Ed.2d 1031. If a company agrees to discharge only for "just" cause, "good" cause, etc., this is a limitation upon what would otherwise be any cause which management might determine to be satisfactory to itself. Good cause, etc., means what a reasonable person would find sufficient; the phrase creates

an objective rather than a personal, subjective test. Even when the company makes a specific commitment to discharge only for "cause," the fact that it has made a special agreement may well warrant the conclusion that this also means an objective type of cause, else there would be no reason for the provision.[3] See, for example, the agreement set forth in Goodall-Sanford, Inc. v. United Textile Workers, supra, 233 F.2d at page 108.

■■ In the case at bar there is no express provision that the Company will discharge only for cause, let alone just cause, good cause, etc., or, in other words, only for objectively sufficient cause.[4] But this is not the whole answer. It is sometimes said that collective bargaining agreements are not like other contracts, and are to be differently interpreted. There is a certain basis for this, in that such agreements, while limited in length and language, must cover, both physically and conceptually, very wide bounds. Nevertheless, the fact remains that such agreements are contracts, and are often highly developed and lengthily negotiated against a background of experience. While a court should be prepared to be less than legalistic, I do not think any court can be expected to adopt an entirely different interpretive approach just because a contract is labeled "collective bargaining agreement." What the court should attempt to do, as

2. The Union at one point suggested to the Company that they arbitrate the arbitrability of the Armstrong grievance, which the Company refused to do. Although the amended complaint sets forth this fact, the Union has not sought in this court to compel arbitration on that basis.

3. Compare the following two provisions: 1. "No employee shall be discharged except for cause." 2. "If an employee is discharged, he shall, on request, be given a statement in writing of the cause therefor." In the first case the provision would mean little or nothing if the employer were to be the sole judge of the cause. Hence, by internal evidence, cause is construed as objective cause. The second provision indicates that cause in some degree must exist, but the pro-

vision as a whole makes entire sense whether the employer is the judge of its adequacy or someone else is. Therefore that clause, standing alone, casts no light on that problem. Of course, as hereinafter discussed, often a clause does not stand by itself, but receives additional light from other sources.

4. Nor does the agreement specifically provide for the arbitration of discharges as in the agreement involved in Boston Mutual Life Ins. Co. v. Insurance Agents' Int'l Union, 1 Cir., 258 F.2d 516, 519, or for the arbitration of disputes over "any matter not provided for in this Contract," as in Bohlinger v. National Cash Register Co., 305 N.Y. 539, 114 N. E.2d 31, 32.

in all other instances, is to put itself in the supposed position of the parties so far as possible, in order to determine what they intended, or would have intended, and in so doing should recognize that parties to one type of agreement have different problems, and perhaps think differently, than parties to some other type of agreement. In this regard it seems to me the most significant possible difference between a collective bargaining agreement and other contracts is the fact that of necessity every future situation cannot be provided for. Hence amplification of expressed provisions may more readily be undertaken by implication than in other more limited and tightly circumscribed situations. I cannot believe that the Court of Appeals intended to preclude reference to implied terms when it said that there is nothing to arbitrate when "there is no language in the collective bargaining agreement to be interpreted and applied * * *." Local 149, American Federation of Technical Engineers v. General Electric Co., 1 Cir., 250 F.2d 922, 930, certiorari denied, 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813. Nor would I hold that the arbitration clause's reference to "the application or interpretation of any provisions of this Agreement * * *" excludes provisions which may be implied. However, the burden of showing that one may be implied must be upon the moving party.

■■ Many generalizations are to be found on the subject of when provisions are to be implied. Thus the Massachusetts court has stated that contractual provisions are to be implied "if the instrument as a whole produces a *conviction* that a particular result was fixedly desired although not expressed by formal words * * *." Dittemore v. Dickey, 249 Mass. 95, 105, 144 N.E. 57, 60, quoted in Spaulding v. Morse, 322 Mass. 149, 152–153. (Italics supplied.) The Supreme Court has said that "a contract

includes * * * such implied provisions as are *indispensable* to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made * * *." Sacramento Navigation Co. v. Salz, 273 U.S. 326, 329, 47 S.Ct. 368, 369, 71 L.Ed. 663. (Italics supplied.) For the reasons previously stated, it is very possible that so heavy a burden is not to be imposed in the case of collective bargaining agreements. Nonetheless, in a matter as important as cause for discharge, I would find it difficult to believe that management is to be understood to have surrendered its traditional right by implication if there were nothing whatever in the agreement making reference to the subject. The matter is too important to be thought to have been overlooked, and too customarily dealt with expressly,[5] for one to assume that the parties either unconsciously left it out, or intentionally omitted it, thinking it to be implicit anyway. However, there was in the 1953 and 1954 agreements the following provision:

(Article XII)

"1. The following shall be the procedure for the adjustment of grievances:

"Step 1. After the occurrence or knowledge of the situation, condition or action of Management giving rise to the grievance (a grievance concerning *dismissal for cause other than layoff for lack of work* must be filed in writing within one calendar week from the time that the Employee was discharged or the same shall be deemed to have been waived by the Employee and Union), Employees may take up grievances with their foreman either directly or through their steward." (Italics supplied.)

It is perfectly true that this provision is primarily a statute of limitations, and

---

5. According to one study, published in 1954, 77% of the contracts sampled at that time stated the grounds for discharge. Bureau of National Affairs, Basic Patterns in Union Contracts, p. 15:51 (3d ed. 1954), reprinted from BNA, Collective Bargaining Negotiations and Contracts.

not an affirmative ,undertaking limiting the Company's right to discharge. Nevertheless, if it is so worded as to suggest the presence, by implication, of some limitation understood between the parties, it would form the basis for a finding that such an understanding existed. I agree with the Company that as a matter of principle a clause does not suggest, or form an affirmative basis for such implication, if it is capable of a reasonable construction that does not carry the implication.[6] Something which points in both directions points in neither. And I might be inclined to agree that the word "cause" in the quoted provision, standing alone, may suffer from such ambivalence were it not for one additional consideration. Article V of the 1943 agreement read as follows:

> "Article V. Dismissal for Cause Other Than Lack of Work.

> "The Union shall reserve the right to question and investigate *any dismissal for cause other than layoff for lack of work and where such cause is not justifiable* the dismissed Employee shall be reinstated and paid for all time lost, provided that the grievance has been filed with the Company within five days from the date that the Employee was discharged." (Italics supplied.)

Very substantial changes occurred in the 1948 and 1953 agreements, and many clauses, and parts of clauses, were shifted about. However, it is clear that in the 1943 agreement the phrase "dismissal for cause other than layoff for lack of work" had a special significance, recognizing that a cause which was not objectively justifiable was proscribed. This exact phrase was repeated in every subsequent agreement. With this historical background it would be open to find that the proper interpretation of the 1953 and 1954 grievance provision would be "dismissal for *justifiable* cause other than layoff * * *," and that there is about the agreement a carried-over aura to the effect that the Union has special rights if a discharge is for a cause not objectively justifiable. If collective bargaining agreements were drawn with the exactness of corporate indentures this might form a very weak basis for implication, and, indeed, an arbitrator might find it insufficient even here, but I am not prepared to say that an arbitrator would not be able to find an implied agreement not to discharge for less than objective cause.

If the agreement can be so construed, there remains one possible question—must the court so construe it, before sending the grievance to arbitration, or is it enough for the court to determine that the claim is well founded and leave the ultimate decision to the arbitrator? In this connection I draw a distinction between preliminary conditions to arbitration, with which the moving party must show compliance, Boston Mutual Life Ins. Co. v. Insurance Agents' Int'l Union, supra, and the substantive elements of the grievance itself. The question of whether the Company has agreed to discharge only for good cause is an integral part of the grievance and is just as much a "matter involving the * * * interpretation * * *" of the agreement as is the question, if the agreement is to be so interpreted, whether a particular employee was so discharged. I hold that it is sufficient for the moving party to show a reasonable basis for interpreting the agreement in such a way that the ultimate grievance becomes arbitrable. Arbitration is "worthy of judicial encouragement," Local 201, etc. v. General Electric Co., supra, 262 F.2d at page 267, and to compel the moving party to present its case to a final conclusion in court as to any aspect of its grievance is a serious encroachment upon the process. The Union is accordingly entitled to an order submitting to arbitration, first, the question of whether the Company agreed to discharge only for objective cause, and secondly, if it did, whether in the case of Armstrong good cause existed.

6. See n. 3, supra.

The remaining issue, raised by the 1958 amendment to the complaint, relates to the payment of so-called "off-step" or "in-between" wages. At least since 1943, all the agreements have contained the following provision or its equivalent:

"The Company shall furnish the Union, within 30 days after the signing of this Agreement, a complete list of job classifications and rate ranges."

The Company furnished lists consisting of a job title and classification number, and as to each classification a rate range containing three figures, which it labelled "Low," "Norm," [7] and "High." Thereafter, and, it is said, long before the 1953 agreement, it paid some of its employees various rates other than Normal, but lower than the High and higher than the Low, hereinafter called "in-between" rates. The Union in 1957 filed grievances on behalf of the employees affected, questioning the company's right to pay such rates, and including claims for adjusted pay back to 1953 computed on the theory that any time a raise was given it automatically should have been to the next specified figure listed, either Normal, or High. The Company resists arbitration, both on the issue of arbitrability, and for a number of reasons which I will somewhat inaccurately group under the heading of laches.

■ The Company contends, first, that this grievance does not involve the "application or interpretation of any provisions of this Agreement." Insofar as this suggests that the list did not become part of the agreement in any way, I do not agree. Whether it did, and to what extent, is right on the face of things at least an arbitrable issue. Passing the question of whether the Company could freely amend the list in every particular at any time,[8] it would seem doubtful, at best, whether the Company retained complete freedom, as for example, to pay some particular employee in an admitted classification less than the stated Low. At the very least the Company would have to change the list. I hold that the application or interpretation of the quoted provision in the agreement which required the furnishing of the list is an arbitrable matter. The interpretation of the list so furnished, if it became part of the agreement, is another.[9]

■ A different question arises with respect to the Union's demands for back pay. Suppose the arbitrator determines that the agreement, as amplified by the lists, does not provide for in-between rates. What is the appropriate relief? The Union says it is payment of the difference between the rate paid and the next higher authorized rate. If the Union was in a position to demand an increase for a particular worker to begin with, that argument might be sound. But with the exception of certain instances not here material, it is not claimed that there was any obligation on the part of the Company to give an employee

---

7. The lists themselves generally used the word "Norm." The briefs, other provisions in the agreement, and correspondence between the parties sometimes refer to "Normal," indicating that the form used in the classification lists is simply an abbreviation.

8. I invited additional evidence on various aspects of this subject after the case had closed, and put the parties to an unexpectedly large amount of work, without their reaching any agreement on the issues so raised. To this last there is one reservation. Both parties apparently agree that my questions, or the responses thereto, were irrelevant to the issues before me. In view of the answers given I will accept that conclusion, with one exception hereinafter referred to.

9. I reach this result independently of the Union's argument that the Company was obliged to furnish a "complete" list of rate ranges, and, instead, supplied a list which did not include the in-between rates, because this argument assumes the point. If "ranges" meant what the Company contends it meant, the lists were complete. Nor do I understand the Union's position that on the Company's contentions the word "Normal" is without "any significance." But I agree with the Union's position without the need of these arguments.

a raise within a particular job classification. The Union, in other words, could not arbitrate a total failure to raise an employee from Normal to High. There was no agreement to do so, and no standard, or as the court put it in Local 201, etc. v. General Electric Co., supra, no "controlling statute to decide the merits of the grievance." I would think also that no standard became established by the Company's electing to raise Employee X two cents, say, of the ten cent differential between his Normal and High. To express it another way, that was not an admission that he was worth the ten cents. But it does not follow, simply because the Union has not persuaded me as to its theory of relief, that none can be established to the satisfaction of an arbitrator. As was shown by the supplemental stipulation and exhibits filed after the closing of the case (note 8, supra), the whole area of wage rates [10] and job classifications is one in which past practice and local understanding play an important role, and is especially appropriate for an arbitrator familiar with the industry. Moreover, even if I should be of opinion that no monetary award was possible, I believe the mere absence of doubt as to the outcome of an otherwise arbitrable grievance should not be ground for denying the reference. Cf. New Bedford Defense Products Division, etc. v. Local 1113, etc., supra, 258 F.2d at page 526.

■■■■■■ This brings me to the special matters alleged by the Company based on the passage of time and other occurrences between the date when it commenced the practice of paying in-between rates under the 1953 agreement and the date the Union first gave notice of the claims to back pay. It is the law of this Circuit that where the agreement does not make arbitrability an arbitrable issue, the merits of any preliminary

grounds on which arbitration is resisted are for the court, and not for the arbitrator. Boston Mutual Life Ins. Co. v. Insurance Agents' Int'l Union, supra. This requires further findings. The Company states that it has paid in-between rates for a decade or more. The Union admits they have been paid since at least the onset of the 1953 agreement (the first under which arbitration could be compelled). The Union first requested a list of all in-between rates immediately after the Supreme Court decision in June, 1957. The list was promptly furnished. A grievance notice was filed in October, 1957. The Company asserts that both the request and the grievance notice were too late to permit the award of back pay from 1953 on. There is no time limit in any agreement for the filing of a grievance. Under these circumstances the test is that of reasonableness. Cf. Boston Mutual Life Ins. Co. v. Insurance Agents' Int'l Union, supra. The Union asserts that it was reasonable to await the decision of the Supreme Court in this case determining that arbitration could be enforced. But the delay of which the Company complains is in the filing of the grievance, not of a demand to arbitrate. This was not in any way dependent upon the Supreme Court. Request for grievance hearings could have been made at any time, even if the court had decided the other way.

■■■■■ However, it is interesting to note the relationship between the Supreme Court decision and the present grievance. After receipt of the opinion the Union requested the information upon which this grievance is based because "we felt that if the Company had tried to pull something like they did on Mr. Boiardi, there might be other people in the plant * * *." Mr. Boiardi had been paid a so-called apprentice rate, lower than the Low. But the significant

---

10. I use this term with some hesitancy, because it is clear that the establishment of rates of pay—that is, new rates—is not arbitrable by virtue of an express exception in the arbitration provision. But that is not to say that the arbitrator

cannot determine what rates the parties have already agreed on, cf. New Bedford Defense Products Division, etc. v. Local 1113, etc., supra, 258 F.2d at page 526, or award appropriate relief.

thing is that the Company had "pulled" this in 1953 or earlier, and the resulting grievance proceeding and request for arbitration had been one of the counts originally filed in this court in 1954. Whatever notice the Boiardi matter furnished had been uppermost in the Union's mind for some four years. Furthermore, as early as 1953 the Union's Treasurer and Business Agent, whose function and responsibility it was to handle grievances, had knowledge of the Company's practice to pay in-between rates, thought it an "abuse," and made a number of complaints to the Company, never reaching the grievance stage. I find that each employee knew of his own rate, and could have found, either by asking the Union on the basis of the information already in its possession, or the Company, whether he was receiving in-between pay, and that at least some of them affirmatively did so. The Union President testified that he had a copy of the list of rate ranges, and that employees often asked him for their own particular range. Testimony to the effect that the whole subject of the payment of in-between rates came as a surprise to him in June, 1957 does not commend itself to me. Instead, I find that the Union knew of the practice, although not of the exact extent of it, and disliked it, but did not pursue the subject because it found in its individual members indifference, based either on lack of confidence, or a fear that a grievance might result in cut-backs to the original "on-step" rate and half a raise was better than none. When, however, the Union won its case in the Supreme Court naturally enthusiasm ran high and the prospect of some four years' back pay put the matter in a different light.

The 1953 agreement was modified in various particulars in 1954 and in 1956 a new agreement was negotiated, to last until 1960. During these negotiations nothing was said by the Union about resolving any alleged ambiguity with respect to the Company's right to pay in-between rates. It is claimed that the Union sought, unsuccessfully, to bring into the agreement a system of automatic progression by step rates, which would have included in its consequences the outlawing of these in-between rates. The Union replies that it was primarily seeking automatic merit increases based on time in grade, and that it does not follow that some measure of a step-rate system did not already exist. I make no finding on this, believing it to be a matter for the arbitrator.

One final fact. I find that in 1956 the parties also entered into a settlement agreement (of which the collective bargaining agreement is one part) in which there is a clause to the effect that the agreement is "intended to be and shall be in full settlement of all issues which were, or which the Union or the Company had by law the right to make, the subject of collective bargaining in negotiations between them preceding the execution of this Agreement."

To begin, perhaps, at the end, the Company contends that this last-quoted clause disposes of the whole in-between rate issue and resulting claims. Whether it does or not is a matter of interpretation for the arbitrator, and I give no further consideration to it. So also is any contention, quite apart from this clause, that entering into the 1956 agreement, in the light of the Company's past practice, was a recognition and acquiescence in the practice. Therefore, so far as the future is concerned, whether the payment of in-between rates is a violation of the agreement, must be an open question. As to this I rule that there cannot be any claim of laches. But as to past damages, there has been obvious delay, and, I find, a manifest change of position. The Union could, and should, have grieved earlier. The Company is in trouble now, if it is in trouble, solely by reason of the fact that it gave raises which it need not have given, and could have discontinued. I believe an appropriate cut-off date would be the date in June, 1957 on which the Union requested a list of employees receiving in-between rates. I find that as to the claims for back pay for periods

prior to this date the Union is guilty of laches, and, accordingly, is not now entitled to arbitration. An order will enter for arbitration of any claims after that date, including a declaration as to the right of the Company to pay in-between rates under the 1956 agreement.

Counsel will submit order.