**INTERNATIONAL BROTHERHOOD OF TELEPHONE WORKERS and Raymond B. DeArville, Jr., Plaintiffs,**

v.

**NEW ENGLAND TELEPHONE AND TELEGRAPH COMPANY, Defendant.**

**Civ. A. No. 63–293.**

United States District Court D. Massachusetts.

April 7, 1965.

Joseph T. Doyle, Boston, Mass., Mayer, Weiner & Mayer, New York City, for plaintiffs.

C. Duane Aldrich, John M. Harrington, Jr., Boston, Mass., for defendant.

JULIAN, District Judge.

This is a civil action brought under Section 301 of the Labor Management Relations Act, 1947, 29 U.S.C. § 185, for breach of a collective bargaining agreement.

The plaintiff International Brotherhood of Telephone Workers (Union) is a labor organization having its principal office in Massachusetts and is recognized by the defendant as the exclusive collective bargaining representative for a bargaining unit made up of the non-supervisory employees of its plant department and portions of its engineering and general services departments.

The plaintiff Raymond B. DeArville, Jr. (DeArville) is a resident of Massachusetts and was employed by the defendant company as a janitor. His employment, which began on February 1, 1960, was terminated by discharge on February 21, 1963. At the time of his discharge DeArville was a member of the plaintiff Union and was covered by the collective bargaining agreement here in issue.

The defendant, New England Telephone & Telegraph Company (the Company), is a New York corporation with its principal place of business in Massachusetts and is engaged in an industry affecting commerce as defined in the Labor Management Relations Act.

At the time of DeArville's discharge from the Company there was in effect a collective bargaining agreement between the plaintiff Union and the defendant Company.

The plaintiffs claim that the discharge was in violation of the collective bargaining agreement. Specifically, the plaintiffs contend that the discharge violated Section Q–1 *General-Administration of Discipline* 3.04 which provides:

"Certain gross violations of rules and other offenses may be considered

as causes for absolute discharge. In such cases, suspension is authorized pending review of facts and recommendation through lines of organization to the General Plant Manager for final action."

The discharge resulted from the theft of a Company automobile from its garage by DeArville's brother and subsequent events concerning the theft.

The Union protested DeArville's discharge through the grievance procedure contained in the collective bargaining agreement without satisfactorily resolving the dispute. The collective bargaining agreement contains no provision for arbitration of unresolved grievances.

The defendant contends that the Court does not have jurisdiction under 29 U.S. C. § 185 (§ 301) to determine the merits of the dispute.

29 U.S.C. § 185(a) provides:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

The Court is unable to adopt the defendant's contention that there is still sufficient life in the Westinghouse case[1] to prevent the plaintiff Union from enforcing the "uniquely personal rights" of a union member under 29 U.S.C. § 185 (§ 301). On this point the Supreme Court has stated in Smith v. Evening News Association, 1962, 371 U.S. 195, 199–200, 83 S.Ct. 267, 269–270, 9 L.Ed.2d 246:

" * * * subsequent decisions here have removed the underpinnings of Westinghouse and its holding is no longer authoritative as a precedent. * * * Textile Workers Union of

[1]. Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1955, 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510.

America v. Lincoln Mills, 353 U.S. 448, [77 S.Ct. 912, 1 L.Ed.2d 972], of course, has long since settled that § 301 has substantive content and that Congress has directed the courts to formulate and apply federal law to suits for violation of collective bargaining contracts."

\*   \*   \*   \*   \*   \*

"The concept that all suits to vindicate individual employee rights arising from a collective bargaining contract should be excluded from the coverage of § 301 has thus not survived."

The Supreme Court reiterated its position in General Drivers, Warehousemen & Helpers Local Union No. 89, et al. v. Riss & Company, Inc., 1963, 372 U.S. 517, at page 520, 83 S.Ct. 789, at page 791, 9 L.Ed.2d 918, stating:

"But since the courts below placed sc much reliance on the Westinghouse decision, we deem it appropriate to repeat our conclusion in Smith v. Evening News Assn., 371 U.S. 195, 199, [83 S.Ct. 267, 269, 9 L.Ed.2d 246], that 'subsequent decisions \* \* \* have removed the underpinnings of Westinghouse and its holding is no longer authoritative as a precedent.' "

On the basis of Smith and General Drivers, supra, this Court is convinced that § 301 of the Labor Management Relations Act encompasses suits brought by unions to enforce rights arising under a collective bargaining agreement even if those rights may be characterized as "personal" to the individual employee.

The discharged plaintiff's standing under § 301 presents greater difficulty. The employee's right to sue finds support in what appears to be a strong dictum in Smith v. Evening News Association, supra, 371 U.S. at page 200, 83 S.Ct. at page 270:

"The same considerations foreclose respondent's reading of § 301 to exclude all suits brought by employees

instead of unions. The word 'between,' it suggests, refers to 'suits,' not 'contracts,' and therefore only suits between unions and employers are within the purview of § 301. According to this view, suits by employees for breach of a collective bargaining contract would not arise under § 301 and would be governed by state law, if not preempted by Garmon, as this one would be, whereas a suit by a union for the same breach of the same contract would be a § 301 suit ruled by federal law. Neither the language and structure of § 301 nor its legislative history requires or persuasively supports this restrictive interpretation, which would frustrate rather than serve the congressional policy expressed in that section."

It is noted that the Court, in a footnote on page 201, 83 S.Ct. on page 270, makes the following cautionary statement:

"The only part of the collective bargaining contract set out in this record is the no-discrimination clause. Respondent does not argue here and we need not consider the question of federal law of whether petitioner, under this contract, has standing to sue for breach of the no-discrimination clause nor do we deal with the standing of other employees to sue upon other clauses in other contracts."

The resolution of the problem of an individual employee's standing to sue for breach of the collective bargaining agreement has thus been left open. This Court, however, is of the opinion that Smith v. Evening News Association, supra, 371 U.S. at 200, 83 S.Ct. 267, clearly points the way. The Supreme Court has advised that not *all* suits by individuals are foreclosed and that § 301 is not to be read restrictively.

To a substantial extent the courts are writing on a "clean slate." They have been directed to fashion the substantive federal law to be applied in suits under § 301. Textile Workers v. Lincoln Mills,

1957, 353 U.S. 448,[2] 77 S.Ct. 912, 1 L.Ed. 2d 972.

The Court is convinced that on the facts of this case the individual employee has standing to sue.

Justice Black, dissenting in Smith v. Evening News Association, supra, 371 U.S. at 205, 83 S.Ct. at 272, observed:

"I cannot believe that Congress intended by the National Labor Relations Act either as originally passed or as amended by § 301 to take away rights to sue which individuals have freely exercised in this country at least since the concept of due process of law became recognized as a guiding principle in our jurisprudence. *And surely the Labor Act was not intended to relegate ,workers with law suits to the status of wards either of companies or of unions.*" (Emphasis added.)

The Court finds persuasive the reasoning of Summers in "Individual Rights in Collective Agreements and Arbitration," 37 N.Y.U.L.Rev. 362, 374, 1962:

"Although federal substantive law controls the rights of the individual employees under the collective agreement, it does not necessarily follow that the individual can bring his suit in the federal district courts. It would be anomalous, however, to find in section 301 authority to impose federal substantive law but no authority for the federal district court to entertain the suit. The charge of Congress is to build a body of federal law consonant with national labor policy. This task would be seriously impeded if all individual suits were channeled through state courts laboring under the dead weight of precedents which consistently ignored federal law and federal policy. A heavier burden would fall on the Supreme Court to enunciate the principles and fashion the rules without any assistance from the lower federal courts."

In attempting to define the nature of the individual employee's rights arising under a collective bargaining agreement, courts have advanced theories based on traditional concepts. In Belk v. Allied Aviation Service Co. of New Jersey, Inc., 2 Cir., 1963, 315 F.2d 513, 516, the court observed:

"They [the courts] have flirted with the theory of a third party beneficiary contract, with a finding of an agency relationship between union and employee, and with application of the principles of the law of trusts. See discussion of these theories in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 210 F.2d 623, 625–627, (3d Cir., 1954), aff'd 348 U.S. 437 [75 S.Ct. 489, 99 L.Ed. 510]. * * * (1955). Strict use of any one of these analogies leads to insurmountable difficulties arising primarily from the fact that collective bargaining agreements are to a large degree *sui generis*."

See also 18 A.L.R.2d 352.

■ The Court is of the opinion that it need not attempt to spin a special theory as to the individual's standing, except to state that in the case of a discharge, where the union and the discharged employee have pursued the bargained-for grievance procedure and are both claiming that the contract was breached by the employer, both are proper parties plaintiff in a federal court under Section 301.[3]

■ The defendant also asserts that Section 301 was never intended to cast the federal district courts in the position of arbitrator. The Court, however, adopts the opinion of Professor Cox:

---

**2.** 353 U.S. at page 456, 77 S.Ct. at page 918: "We conclude that the substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws."

**3.** See Harmon v. Martin Brothers Container & Timber Products Corp., D. Ore., 1964, 227 F.Supp. 9; Bey v. Muldoon, E.D.Pa.1963, 217 F.Supp. 404.

"When actions for breach of the substantive terms of a contract are instituted under Section 301 in the absence of an arbitration clause, the courts should assume the arbitrator's responsibility." [4]

■ The Court agrees with the Court of Appeals for the Fifth Circuit in Allied Oil Workers Union v. Ethyl Corporation, 5 Cir., 1965, 341 F.2d 47, that the availability of a judicial forum for the resolution of such disputes promotes industrial peace, which is one of the primary aims of the Labor Management Relations Act.[5]

[5] The defendant's last objection is that a judicial determination of the present dispute might not foreclose the Union from striking should the decision be in favor of the Company. Be that as it may, the Court cannot be deprived of its jurisdiction merely because of the possibility that one of the parties might resort to self-help.

■ The Court holds that it has jurisdiction over the parties and the subject matter of this action under Section 301 of the Labor Management Relations Act, 1947 (29 U.S.C. § 185).

■ In their attempt to establish a breach of the collective bargaining agreement, the plaintiffs assert that Section Q–1, 3.04 (quoted in full, supra) requires that suspension precede discharge. Under no reasonable interpretation can the provision, "In such cases, suspension is authorized pending review of facts * * * *", be held to make suspension a mandatory requirement during investigation. Suspension is merely authorized and not required.

The plaintiffs attempted to show that there was a material breach of the collective bargaining agreement in that the General Plant Manager did not take the final action as required in the agreement (Q–1, § 3.04).

In July, 1962, some of the functions performed by personnel of the Plant Department were transferred to the General Services Department, which was made a new and separate department. DeArville was transferred to that department. His transfer did not affect his status as an employee covered by the collective bargaining agreement. At the time of his discharge DeArville was an employee in the General Services Department.

■ The Court finds that the parties modified the agreement in this procedural aspect. The Union and the Company by their conduct clearly showed that they intended that whoever occupied the equivalent position, and had the equivalent responsibilities of the General Plant Manager, in the new General Services Department would be the one who would take the final action. The Union expected that this would be so, and assented to the new conditions made necessary by the Company's change.

The defendant contends that the collective bargaining agreement did not restrict the Company's right to discharge employees.

Judge Aldrich outlined the principles involved in resolving this question in Local 205, United Electrical, Radio and Machine Workers of America v. General Electric Co., D.Mass., 1959, 172 F.Supp. 53, 56:

"Customarily it is management's right to hire and fire as it sees fit, unless by contract the parties have agreed to limitations on this right [citing cases]. * * * If a company agrees to discharge only for 'just' cause, 'good' cause, etc., this is a limitation upon what would otherwise be any cause which management might determine to be satisfactory to itself. Good cause, etc., means what a reasonable person would find sufficient; the phrase creates an objective rather than a

4. "Reflections on Labor Arbitration," 72 Harv.L.Rev., 1482, 1512 (1959).

5. International Union, UAW, etc. v. Webster Electric Co., 7 Cir., 1962, 299 F.2d

195, 197. "Lacking an arbitration clause in the case at bar, the question of whether contracting out violated the agreement is a question for the judiciary."

personal, subjective test. Even when the company makes a specific commitment to discharge only for 'cause,' the fact that it has made a special agreement may well warrant the conclusion that this also means an objective type of cause, else there would be no reason for the provision."

The pertinent section of the collective bargaining agreement is Q–1, titled "Administration of Discipline":

"1. GENERAL

"1.01 This section outlines the policies and procedures of the Plant Department in the administration of discipline.

"2. POLICY

"2.01 It is the policy of the Plant Department to obtain the desired results whether in quality of workmanship or in the observance of the company rules by co-operation rather than by disciplinary action.

"3. PROCEDURE IN CARRYING OUT PLANT POLICY

"3.01 In carrying out this policy, it is desirable and necessary that supervisors, especially foremen, deal with employees on the basis of developing their efficiency and loyalty as individuals, rather than by forcing results under threat, express or implied of disciplinary action. Every effort should be exerted to enable employees to overcome deficiencies of conduct or performance.

"3.02 Special consideration should be given to the question of retaining any employee who is persistently deficient but only after suitable and timely warnings have been given and after effort has been made to help the employee to overcome his shortcomings. In serious cases, record should be made on Employee's Record of such warnings and efforts. * * *

"3.03 In each case where the employee does not show the desired improvement in response to the supervisor's efforts and it appears that disciplinary action may be required, the Personnel Supervisor should be informed. * * *

"3.04 Certain gross violations of rules and other offenses may be considered as causes for absolute discharge. * * *"

The quoted provisions restricted the Company's unlimited right to discharge employees. Encouragement and guidance is to be the rule, and disciplinary action the exception. As a general rule, discipline is to be administered only after the employee does not respond to management efforts. However, discharge without warning or corrective effort is permitted where the employee commits a gross violation of the company rules or some other serious offense.

The entire disciplinary section indicates that the Company's right to discharge is to be exercised on the basis of an objective standard,—what a reasonable man would find to be sufficient cause for discharge.

The facts found by the Court leading up to DeArville's discharge are summarized as follows:

On Sunday, December 30, 1962, DeArville, with his brother Charles, aged 19, who was not an employee of the Company, entered the Company's building through its loading platform.[6] DeArville was not scheduled to go on duty at that time, having finished his tour of duty earlier. No significance is attached to this return to the building inasmuch as he had a valid reason for returning. DeArville a..d his brother Charles went to the cafeteria in the building and returned to the first floor lobby from where they went to a lower level via a stairway. Ostensibly DeArville had a right to go into the areas he did go. While they

---

6. The building was not open to the general public on this day.

were on the lower level DeArville showed his brother the interior of the garage. They both started back towards the first floor lobby. Charles never returned to the lobby but stayed on the stairway between the lower level and the first floor.

DeArville left the building. His brother remained in the building unattended.[7] Before leaving the building DeArville made no attempt to locate his brother or to find out what he was doing in the building.

Charles returned to the garage immediately, from which he stole a Buick automobile which was the property of the Company. Thereafter, while driving the automobile Charles was involved in two accidents in which the Company's car was damaged.

The plaintiff DeArville was questioned on January 2, 1963, by a Mr. Desmond, a Company representative. At that time he knowingly gave false and misleading information concerning his and his brother's activities in the Company's building on December 30, 1962. DeArville told Mr. Desmond that he and his brother went nowhere in the building other than the loading platform, the men's room off the first floor lobby, and the lobby itself, and that the last time he saw his brother he was near the front door of the building. DeArville knew these statements were not true.

On DeArville's own admission he knew at least as early as the evening of January 2, 1963, that Charles had taken the Buick from the Company's garage and had damaged it.

On January 7, 1963, DeArville knowingly gave false and misleading information to Mr. O'Brien, the building manager, concerning his brother's activities in the building on December 30, 1962. DeArville told Mr. O'Brien that his brother did not remain in the building, that his brother came into the building but left immediately by the front door. DeArville knew these statements were not true.

On January 10, 1963, DeArville knowingly gave false and misleading information to the Company in the form of a written statement (Exh. 1) concerning his and his brother's activities in the building on December 30, 1962. Not only did he fail to report that his brother took the Company car, but falsely reported that his brother had left the building by the front door and indicated that neither he nor his brother were in the garage area of the building.[8]

At all pertinent times there were in effect various Company rules which were issued in booklet form to all employees, including DeArville. One set of rules was "General Rules for Plant Employees," which was issued by the Operations Vice President of the Company. At the time of the theft and subsequent thereto DeArville was no longer in the Plant Department, but rather was a member of the General Services Department. The General Services Department was a new department which appears to have been brought about by an internal rearrangement of Company functions. The transfer had no effect on DeArville; his pay, place of work, and duties were the same after the transfer as before. However, the rules are quoted solely to indicate the standards of conduct that the Company expected its employees to observe.

The "General Rules for Plant Employees" contained the following:

"* * *

"They [the rules] may not be waived in any respect and any willful violation may be cause for disciplinary

---

7. DeArville knew before December 30, 1962, that his brother had a prior criminal record of petty larceny and had been convicted and sentenced to jail.

8. It should be noted that on January 11, 1963, DeArville did give a more complete statement (Exh. 2) to the Company concerning his and his brother's activities in the building on December 30, 1962, which was substantially the same as his testimony before the Court. The Court, however, is satisfied that DeArville has *not* told all he knows about the circumstances surrounding the theft of the automobile.

action including dismissal from the service.

"1. Every employee is expected to be familiar with and obey * * Company or department rules * * *. Lack of such knowledge will not serve to excuse any failure to observe them.

"2. A steadfast loyalty to the Company's interest is demanded from every employee. * ~ *

"3. The Company expects and requires absolute honesty from every employee in all dealings with * * * the Company.
       * * *

" * * *

"18. No employee shall make, certify or approve any record, statement or report known by him to be false."

There was another set of Rules of which DeArville had notice, entitled "Safeguarding and Accounting for Supplies and Equipment." This set reproduces on page 4 thereof Rule 3 quoted in part above. This set of rules was also directed to the Plant Department employees and is noted here only to indicate standards of conduct that an employee was expected to observe.

The defendant Company has at all times justified its discharge of DeArville on two grounds.

■ First, the Company asserts that DeArville aided and abetted Charles in the theft of the car. Although this ground is not wholly without evidentiary basis, the evidence is insufficient to establish it as a fact.

The second ground asserted by the Company is that DeArville was disloyal to the Company in that he made false statements to and was uncooperative with Company representatives who were investigating the theft of the car.

Applying an objective, "reasonable person" test, it is clear to the Court that DeArville was guilty of an offense sufficiently serious to justify his discharge.

His false and misleading statements, which were willful breaches of the Company's standards and of his duty as an employee, were made in connection with an extremely serious matter. But for DeArville's bringing his brother to the building, showing him the interior of and entrance to the garage, and leaving him unescorted in the building, the theft would not have occurred. He owed the Company full cooperation in the investigation which followed the discovery of the theft. The purpose of his false statements and of his failure to cooperate was to shield Charles, and perhaps himself, without regard to the duty of truthful disclosure that he owed his employer.

■ DeArville's misconduct constituted offenses within the meaning of Section Q–1, Par. 3.04, of the collective bargaining agreement which could reasonably be considered just cause for his absolute discharge. The Company did not violate the agreement in discharging him.

The plaintiff's complaint is dismissed.